**BURLEY IRR. DIST. v. ICKES,**
Secretary of Interior.

No. 7522.

United States Court of Appeals, for the District of Columbia.

Decided Sept. 30, 1940.

Writ of Certiorari Denied Feb. 3, 1941.
See 61 S.Ct. 614, 85 L.Ed. ——.

530

E. Barrett Prettyman, F. G. Awalt, and Raymond Sparks, all of Washington, D. C., and S. T. Lowe, of Burley, Idaho, for appellant.

Nathan R. Margold, Sol., Frederic L. Kirgis, and Phineas Indritz, all of the Solicitor's Office, Department of the Interior, all of Washington, D. C., and B. E. Stoutemeyer, of Portland, Or., for appellee.

Before GRONER, Chief Justice, and EDGERTON and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

The appeal is from a judgment dismissing Burley Irrigation District's suit to enjoin the Secretary of the Interior from crediting the proceeds of sales of electric power in the Minidoka Irrigation District and the town of Minidoka, Idaho, in any manner other than 95.6% to plaintiff and 4.4% to Minidoka Irrigation District. The dispute relates only to a portion of the proceeds of these sales, namely, $50,000, which plaintiff claims is part of the net profits for 1935 produced by the Minidoka power plant. The Secretary has determined that this $50,000 is not net profits attributable to that plant, but is rather in effect either an operating expense or proceeds from the sale of power not produced by the Minidoka plant. It is admitted that the plaintiff is entitled to be credited with 95.6% of the net profits produced by the sale of power generated at the Minidoka plant, under the decision of this court in Wilbur v. Burley Irrigation District, 1932, 61 App.D.C. 145, 58 F.2d 871. The basic issue here does not question the respective proportions fixed by that decision for the distribution, by credits, of such profits, but relates to whether the Secretary properly determined that the $50,000 in question was not part of the plant's net profits.

That issue has been obfuscated in the presentation of the cause by submergence in many collateral ones. Stated roughly, the foundation of the plaintiff's claim is that it is "the owner" of 95.6% of the power plant, that it was adjudicated such in Wilbur v. Burley Irrigation District, supra, and as such is entitled to have credit for 95.6% of the $50,000 in question. In order to state the issues and the respective contentions of the parties accurately, a detailed statement of the facts, and especially of the legislative history of the Minidoka Reclamation Project, is necessary. At the outset we may say that we find the plaintiff's contentions without merit, and therefore the judgment must be affirmed.

Burley Irrigation District and Minidoka Irrigation District are two of seven major divisions of the Minidoka Reclamation Project, located in the Snake River Valley, Idaho, and established pursuant to the Act of June 17, 1902, 32 Stat. 388, 43 U.S.C. (1934) c. 12, 43 U.S.C.A. § 371 et seq., commonly known as the Reclamation Law. The primary object of the statute, and of the project, is the reclamation of arid lands through irrigation. The production of power for pumping in connection with irrigation is an important incident to this main object. Disposition of surplus power, not required for pumping or other uses of irrigation, for commercial uses is authorized by an amendatory act of April 16, 1906, set forth below.[1] But the develop-

---

[1] "Whenever a development of power *is necessary for the irrigation of lands,* under any project undertaken under the said reclamation law, or an opportunity is afforded for the development of power under any such project, the Secretary

ment and sale of such power is authorized only as an incidental phase of reclamation, not as a primary or independent end in itself. The statute and its amendments are *reclamation* acts, not commercial power development acts. The legislation is entirely inconsistent with the development and sale of commercial power whenever that may interfere with the development of irrigation or "impair the efficiency of the irrigation project." To assure that the secondary conservation of power will not impair the primary conservation of water for irrigation, the authority to dispose of surplus power is vested exclusively in the Secretary and is circumscribed by limitations upon the manner, term and purpose of the disposal wholly inconsistent with permanent appropriation of power to non-irrigating uses and with subordinating irrigation to commercial sale.

The Minidoka Project is dependent on three reservoirs: Jackson Lake Reservoir, located in Wyoming about 250 miles upstream from the project; American Falls Reservoir, located 40 miles upstream; and Lake Walcott Reservoir. The last named is created by Minidoka Dam, which lies immediately above the Burley and Minidoka Districts and serves both. Minidoka District, containing about 71,000 acres on the north side of Snake River, is irrigated primarily by gravity flow of water. Burley District, embracing about 46,000 acres on the south side of the river, consists largely of higher ground which must be irrigated

by pumping water from the reservoir up to its level. Power for this pumping is derived chiefly from the Minidoka Power Plant, which is located at and forms a part of the Minidoka Dam. [2]

The Minidoka Project, the various divisions thereof, and all structures and facilities in connection therewith, including both irrigation and power works, were constructed by the United States, and the costs of construction were met with moneys from the Reclamation Fund. For many years the entire project was administered solely by the Bureau of Reclamation. The works therefore were originally the property of the United States, as to both legal and equitable titles, and they remain so today except to the extent that they have been transferred to others under legal authority. [3] Furthermore, by adjudication of the state court of Idaho in 1913, and later of the United States District Court for the District of Idaho, priorities in the appropriations and rights to receive the waters of the Snake River were determined, and those applicable to lands within the project, including that for power at Minidoka Dam, were decreed to the United States. Thus the Government originally owned without qualification not only the works of the project, but the water right from the use of which plaintiff asserts its claim here. That ownership continues unabated, except as it has been modified or transferred pursuant to authority given by Congress.

of the Interior is authorized *to lease for a period not exceeding ten years*, giving preference to municipal purposes, *any surplus power or power privilege*, and the moneys derived from such leases shall be covered into the reclamation fund and be placed to the credit of the project from which such power is derived: *Provided, That no lease shall be made of such surplus power or power privileges as will impair the efficiency of the irrigation project.*" 34 Stat. 117, 43 U.S.C. § 522, 43 U.S.C.A. § 522. (Italics supplied.)

[2] The Idaho statutes provide for the organization of irrigation districts, which are quasi-municipal corporations composed of and serving individual water users, who own the lands located within and served by the district. Burley Irrigation District and Minidoka Irrigation District are corporations of this character organized under these statutes. In the terminology of the project, which is organized and administered under the

Federal Reclamation Act and amendments, the water users of the Burley District are known as the South Side Pumping Division and those of the Minidoka District as the Gravity Division. There is of course a dovetailing of federal and state laws in the control of the complicated structure of rights and organization which characterizes the project as a whole.

[3] Section 6 of the Reclamation Law provides: "The title to and the management and operation of the reservoirs and the works necessary for their protection and operation shall remain in the Government until otherwise provided by Congress." 32 Stat. 389, 43 U.S.C. § 498, 43 U.S.C.A. § 498. Cf. Twin Falls Canal Co. v. American Falls Reservoir District No. 2, 9 Cir., 1932, 59 F.2d 19, certiorari denied, 1932, 287 U.S. 638, 53 S.Ct. 87, 77 L.Ed. 552; United States v. Power County, Idaho, D.C.Idaho, 1937, 21 F.Supp. 684, 687.

But the Reclamation Law contemplated entry by individuals upon the public lands improved by the project and application of the project waters for their benefit, and for that of private owners of land within the project. It provided for the assessment of construction charges against the land to be benefited, 32 Stat. 389, 43 U.S.C. § 419, 43 U.S.C.A. § 419; for payment of these charges by instalments over a long period of time, and for the recovery of such payments into the Reclamation Fund, 32 Stat. 389, 43 U.S.C. § 461, 43 U.S.C.A. § 461. By Act of August 13, 1914, provision was made for cancellation and forfeiture of water-right applications and entry on default in payment of construction charges, for assessment and collection of operation and maintenance charges, 38 Stat. 687, 43 U.S.C. §§ 480, 481, 492–497, 43 U.S.C.A. §§ 480, 481, 492–497, and the Secretary was authorized, in his discretion, to transfer the *"care, operation,* and *maintenance* of all or any part of the project works" to any legally organized water users' association or irrigation district.[4] By Act of December 5, 1924, herein referred to as Subsection I, Congress provided: "Whenever the water users take over the care, operation, and maintenance of a project, or a division of a project, the total accumulated net profits, as determined by the Secretary, derived from the operation of project power plants, leasing of project grazing and farm lands, and the sale or use of town sites shall be credited to the construction charge of the project, or a division thereof, and thereafter the net profits from such sources may be used by the water users to be credited annually, first, on account of project construction charge, second, on account of project operation and maintenance charge, and third, as the water users may direct. No distribution to individual water users shall be made out of any such profits before all obligations to the Government shall have been fully paid." 43 Stat. 703, 43 U.S.C. § 501, 43 U.S.C.A. § 501. Reference has been made previously to the provision concerning the development of power and the limited authorization of disposal of surplus power for commercial use.

The Minidoka Project was approved by the Secretary in 1904, and the Minidoka Dam, built primarily as a diversion dam, was completed in 1906. From the beginning, however, it was recognized that power would be necessary for the pumping of water to the lands lying above the level of the point of diversion, chiefly in the South Side Pumping Division, now organized as Burley District. Accordingly, the dam was constructed originally with penstocks or openings for use in supplying water for the generation of power. Construction of the power plant was begun in 1908, the first of six generating units was completed in 1909 and the last in 1926. The power plant therefore is physically an integral part of the structure of the dam, which performs the multiple functions of storage, diversion and generation of power. Early in the life of the project, power generated in excess of that required for irrigation pumping was sold to residents on the project and in adjacent towns for commercial purposes. With the steady expansion of generating units, this sale of power has become extremely profitable, and since 1915 it has resulted in a profit over and above all operating expenses and costs of new construction or improvements in the power system.

In 1915, pursuant to authority conferred by the Act of August 13, 1914, 38 Stat. 690, 43 U.S.C. 373, 43 U.S.C.A. § 373, the Secretary of the Interior set in motion the machinery for determining costs of construction on the Minidoka Project and making assessments against the lands benefited to

---

[4] "Whenever any legally organized water-users' association or irrigation district shall so request, the Secretary of the Interior is authorized, in his discretion, to transfer to such water-users' association or irrigation district the care, operation, and maintenance of all or any part of the project works, subject to such rules and regulations as he may prescribe." 38 Stat. 687, 43 U.S.C. § 499, 43 U.S.C.A. § 499. An apparently mandatory provision for the transfer of the "management and operation" of irrigation works to "the owners of the lands irrigated thereby" is made in the Act of June 17, 1902, 32 Stat. 389, 43 U.S.C. § 498, 43 U.S.C.A. § 498. But it is not involved in this suit as the basis of any transfer and applies only "when the payments required by this chapter are made for the major portion of the lands irrigated from the waters of any of the works herein provided for," and it is explicitly provided: "That the title to and the management and operation of the reservoirs and the works necessary for their protection and operation shall remain in the Government until otherwise provided by Congress."

repay them. Local boards of review and a central board of review were created and instructed to investigate the costs and report to the Secretary in order to aid him, as required by statute, to determine the just and equitable charges or amounts to be collected from the various units.

Upon the recommendation of the appropriate boards, in 1915 the Secretary allocated the original cost of the Minidoka Dam ($676,575.37) between the Minidoka District and the Burley District in accordance with the proportion of project land within each, namely, 59.2% to the former and 40.8% to the latter. However, since the development of power for pumping was necessary chiefly for the irrigation of the South Side Division (Burley District), the cost of constructing the power plant ($455,-317.40) was allocated between the two divisions in the proportions of 95.6% to the pumping unit (Burley) and 4.4% to the gravity flow unit (Minidoka), this apportionment being based on the respective peak demands for power during the irrigation season, which in average length includes 170.5 days in spring and summer.

The Minidoka Project includes a separate commercial power division, created for operation of the commercial power business. The great surplus of power, available from the beginning for disposition to commercial use outside the irrigation season, required constant expansion in transmission lines, new substations, and enlargement of the old ones. The necessity for making this expansion as well as for handling operation of the business resulted in establishing the commercial power division. Charges were made to it for costs of power generating units, transmission lines, transformers, substations and other electrical works used in generating and distributing surplus electric power for commercial purposes, including heating, lighting and general power purposes, and have been paid for from earnings of the plant. No part of the cost of the dam or of the power plant (apart from this equipment) was charged to the commercial power division. The cost of transmission lines not used primarily for commercial power purposes apparently was charged to Minidoka and Burley in a ratio different from that adopted for cost of the plant.

On the basis of these cost determinations, assessments were made against the lands benefited. [5] The total amount charged to lands in Burley was $2,785,307. This was assessed at $56.50 per acre for public lands (subject to entry) and $57.50 for private lands. All entrymen and landowners in the unit executed water-right contracts, on forms prescribed by the Secretary, by which they agreed to pay these acreage charges and also annual charges for operation and maintenance.

As stated above, the entire project was managed and operated for many years by the Bureau of Reclamation. But on March 15, 1926, pursuant to the Act of December 5, 1924, [6] a contract was made between the United States and Burley District, whereby the latter took over the *care, operation* and *maintenance* of certain minor works, including specified irrigation canals, telephone lines, and three pumping plants (located several miles from the dam site and power plant), which were designated as "transferred works." It was provided that the United States "will continue to operate and maintain the works used in common by the Burley and Minidoka Irrigation Districts," which were called "reserved works" and included the reservoirs; the Minidoka Dam and the canal headgates at the dam; "the power plant at the Minidoka dam, the transmission lines leading therefrom and used in connection therewith, and the transformer stations appurtenant to said power system." The reserved works have remained under the operation and maintenance of the United States, acting through the Secretary, and no other transfer has been made to Burley District than that involving the minor "transferred works" under the contract.

The contract also contained provisions for the determination, announcement and distribution by credit between the two districts of net profits accumulated and to be earned annually, purporting to be made "pursuant to the provisions of subsections I and J of Sec. 4 of said Act of December 5, 1924," 43 U.S.C.A. §§ 501, 526 (Subsection I, set forth above). By the express terms of Subsection I, it is applicable "whenever the water users take over the care, operation, and maintenance of a project, or a division of a project." At the

---

[5] Earlier assessments, not involving power costs, had been made against the lands in the gravity division.

[6] See note 4 supra.

date of contract, neither the water users nor the districts had taken over "the care, operation, and maintenance" of the power plant or the commercial power business. Nor have they done so since that time. Although the contract transferred to the water users the management of only the minor works described above, the Secretary undertook to "determine and announce the total accumulated net profits to be credited under said subsections to the Minidoka project, and what portions thereof to the said completed divisions, included in the Burley and Minidoka Irrigation Districts," as well as the proportionate shares to be credited to the lands in each district. Credits so allowed to the district were to apply to the construction charge against the district, to be divided among its irrigable lands according to acreage, with no distribution of profits to individual water users prior to full payment of all obligations to the United States. There was similar provision for annual determination and announcement by the Secretary of net profits as earned, and for crediting them substantially in the same manner as that provided in Subsection I, namely, first, on the annual instalment of project construction charges against the district; second, upon operation and maintenance charges; third, as the district might direct, but in no event to individual water users before full payment of all obligations to the United States. Provision was made for reservation of $300,000 from the accumulated net profits to "make some provision for supplying the growing demand for commercial power on the Minidoka project and also the additional power which will be required for pumping additional water for the lands in the Burley District," and for deducting $50,000 from net profits to enlarge and improve its canals. The district assumed and agreed to pay the remaining unpaid balance of construction indebtedness and charges against its water users.

Pursuant to the contract, on March 14, 1927, the Secretary determined that the profits which had accumulated from leasing excess power from the Minidoka plant should be distributed 95.6% to Burley District and 4.4% to Minidoka District, basing these proportions upon those adopted previously for allocating construction costs of the plant between them. This apportionment was adhered to by successors in office until 1929 when Secretary Wilbur attempted to reapportion the profits by allocating a larger share to Minidoka. This action re-sulted in the litigation in Wilbur v. Burley Irrigation District, supra, in which on appeal we held that Burley District had a "vested" property right to have the accumulated and annual net profits of the plant credited in accordance with the percentages fixed in the Secretary's original apportionment, that he exhausted his authority to fix such percentages when he exercised it for the first time, and that he had no power thereafter to change them.

The establishment of this ratio of profit division made it to the interest of the Burley District and its constituent landowners to have the largest possible net profits made, determined and distributed by credit, by the Secretary in operating the power plant. From their point of view, it became desirable to have the maximum flow of water through the plant for generating surplus commercial power. This interest of the district coincided with a constantly growing demand for commercial power due to increase in population incident to development of the entire project. The demand comes from consumers in both districts, but more largely from Minidoka, because it is larger in area and because urban growth has been greater there. Simultaneously the Burley District has required more and more power for irrigation pumping, due to expansion of its irrigating system, widening of canals and laterals, etc.

In one highly important respect these two demands for power have clashed, presenting the possibility that satisfaction of one would make impossible fulfilling the other. The peak of the irrigating season comes in the summer and especially in the late summer. Notwithstanding the constant expansion of the plant's generating capacity, for many years the entire output of power has been required to operate the pumping machinery at the peak period. During the nonirrigating season, roughly from October to April, little or no power is required for pumping. The result is that almost the entire output of the plant is available during the winter months for commercial sale. But during the summer at the peak of the irrigating season none of the energy generated at the plant is available for this purpose. Use of water and power for irrigation is the prior use, and there is at that time no surplus power for commercial sale. Some of the commercial demand is seasonal, as with electrical heating of houses and buildings during the winter. Such sale of course is entirely consistent with prior

satisfaction of the demand for power for pumping. But this use alone is not profitable, the trial court finding that proceeds from sales for heating are sufficient hardly to pay more than the cost of operating the plant.[7] Sales for nonseasonal uses, such as electric lighting, cooking, etc., are necessary to make the commercial power business profitable, and it is from these sales that the large profits of the plant have been derived.

▇ To supply the nonseasonal demand, "firm" power is required, that is, power which is available, constantly and uninterruptedly, throughout the year. Since substantially the entire output of the Minidoka plant is required for 'pumping at the peak of the irrigating season and much of it during the remainder of the season, obviously no power, or little, is available from the plant as surplus power for commercial sale at that time. Consequently, if the commercial business were dependent exclusively upon the power generated at the plant, it could not be carried on. The interruption of service required by application of the plant's output at the peak and, to a somewhat less extent, during the remainder of the irrigating season would destroy the business. Furthermore, the entire project has been handicapped at times by serious shortage of water. When this occurs, not only the secondary and surplus uses, but the primary ones, are jeopardized. Every reasonable measure of conservation is required to protect both and to secure the rights of individual water users. Although the doctrine of prior appropriation fixes priorities among individual appropriators in the use of water according to the maxim, qui prior in tempore, prior in jure est, it confers no right upon the prior appropriator to waste water. His right is qualified by the limitation, made in favor of subsequent appropriators and the widest possible use of water on arid lands, that all of the water he uses must be beneficially applied and with reasonable economy in view of the conditions under which the application must be made.[8] Hence a use which is wasteful may be restricted in the interest of subsequent appropriators and thus of the conservation of water. Shortage makes the elimination of waste imperative.

During the years from 1931 to 1935, particularly, there was a serious shortage of water in the Snake River Valley. Because of this, the American Falls Reservoir (by far the largest of the three in the project) failed to fill and the consequent want of sufficient water for irrigation resulted in severe crop losses, particularly in 1934. Of the three reservoirs, the Minidoka Dam lies farthest downstream. There is no other below it. Water passing the dam therefore exhausts its usefulness in passing, for the entire project and for beneficial application except domestic, stock watering and municipal uses below the dam. Water passing in winter serves only to generate power at the plant for commercial sale, is useless for irrigation and pumping, and is lost therefore to the project, including Burley District, for its primary purposes. Winter flow is therefore highly wasteful. Unsupplemented, it produces only a seasonal source of power for the unprofitable heating business; only when supplemented by power from the outside to prevent interruption of service can it be used for profitable commercial sale, and even that use consumes a vast volume of water needed for irrigation.

During the nonirrigating season in the shortage from 1931 to 1935, the Minidoka power plant used over 225,000 acre-feet of water to produce power, an amount which if stored for summer use was approximately sufficient, as the trial court found, to irrigate all of the Burley District. But as actually used by winter flow, this water was lost entirely to the primary use of irrigation in the project, including Burley District, at the very time when the district was expanding its irrigation system and securing additional storage facilities in the American Falls Reservoir.

---

[7] The finding (No. 27) states: "That without the power which was brought to the Minidoka Project by the Idaho Power Company in exchange for the power from the Government's Black Canyon power plant, the amount which could have been secured from the sale of such surplus power as might be available from the Minidoka plant during the nonirrigation season for heating purposes would have produced no net profit at all, because the low price applicable to such power for heating purposes would scarcely pay the cost of operating the power plant."

[8] Griffiths v. Cole, D.C.Idaho 1919, 264 F. 369; Glavin v. Salmon River Canal Co., 1927, 44 Idaho 583, 258 P. 532; cf. Vineyard Land & Stock Co. v. Twin Falls Oakley Land & Water Co., 9 Cir., 1917, 245 F. 30; Niday v. Barker, 1909, 16 Idaho 73, 101 P. 254.

Prior to the shortage of 1931-1935, the Secretary had supplemented the power generated at the Minidoka plant by bringing in power from outside sources, thereby preserving the commercial business and its profits. But with the shortage, further measures of conservation became necessary both to fulfill irrigation requirements in the project, including the district, and to preserve the commercial business. The Secretary therefore instituted a plan to accomplish these ends. In broad outline it involved cessation of winter operation of the Minidoka plant and storage of the winter flow thereby conserved in the project reservoirs, principally at American Falls, for summer use. But to avoid destruction of the commercial business, the Secretary arranged to bring in "firm" power from an outside source to supplement what the plant would generate. He accomplished this by an agreement, effective October 1, 1934, with the Idaho Power Company, a private utility, which provided, in effect, for an exchange of power between that company and the Government's Black Canyon power plant on the Payette River in western Idaho. The Idaho Company generated power for commercial sale at its plant located at American Falls. It agreed to deliver power from this plant for distribution to the consumers of commercial power within the Minidoka project, replacing that formerly generated at Minidoka during the winter and supplementing that produced there in the summer, so that there would be no interruption either of commercial sale or of irrigation pumping. In exchange for this power, the company receives power from the Government's Black Canyon plant, not part of the Minidoka project, which it distributes to customers in the region of that plant.

The contract recited the recent shortage of water, the necessity for greater conservation both to provide for irrigation requirements and to supplement the power requirements of the Minidoka project, and provided for specified winter and summer deliveries at the Minidoka plant in three separate paragraphs, one of which extended for the term of the contract an agreement made in 1930 for delivery of surplus power from the Black Canyon plant to the Idaho Company. In addition to the exchange of power, the trial court found that other considerations inducing the company to enter into the contract of 1934 were: (1) its interest in conservation of water; (2) the Government's agreement to forbear installing a previously planned power plant at American Falls, which would compete with the company's plant there; and (3) permission for the company to use in its plant whatever water would be released from the American Falls Reservoir.

The contract reserved to the Secretary the right to terminate it in the event of final judicial decision (A) that he could not lawfully secure "an annual net income of $50,000 to reimburse the United States for the use of the Black Canyon plant" (1) by charging that sum as operating expense to those "benefited by the water saved hereunder" and (2) by sale of the power received from the company or (B) that he might not discontinue or reduce the nonirrigating use of the Minidoka plant to conserve the river flow for irrigation uses.

The Secretary also entered into a contract with the Minidoka Irrigation District by which it guaranteed a $50,000 return on power furnished to its consumers through or by virtue of the Idaho Power Company contract, on the understanding that collections in the past from power sales in the district had been approximately $50,000 a year.

Beginning in 1935, the Secretary ceased operating the Minidoka plant during the nonirrigating season, but continued to supply the commercial customers with energy received from the Idaho Power Company. During the irrigating season power generated at Minidoka has been supplemented with power supplied by the Idaho Company, so that all demands for power, both for irrigation in Burley District and for commercial sale, have been met, even at the peak of the season.

On March 12, 1936, the Secretary found that the net profits from total sales of power within the Minidoka project during 1935 amounted to $119,128.78. Of this total, he determined that $66,744.26 was derived from the sale of power generated at the Minidoka plant and therefore was attributable to it. The remainder, $52,-384.52, he determined was derived from the sale of power received under the Idaho Power Company contract and not generated at the Minidoka plant. He therefore held that this sum was not attributable to that plant as net profits produced by its operation. He allocated 95.6% ($63,807.51) of the $66,744.26 to Burley District as its proportionate share of the net profits produced by the plant's operation, and 4.4% ($2,936.75) to Minidoka District. Of the

$52,384.52 found to be profits derived from the Idaho Power Company contract, he apportioned $2,384.52 to the Minidoka District, as compensation under his contract with it for performing services including collections, and $50,000, the amount which Minidoka District had guaranteed, to the Black Canyon plant to compensate the Government for the power supplied from that plant to the Idaho Company under the contract.

It is this apportionment of profits which is in dispute in this action. Burley District claims that it is entitled to receive 95.6% of the entire $119,128.78, but since the Minidoka District is not a party to this suit it makes no effort here to deprive it of the credit for $2,384.52 allocated as compensation for services in the sale of the power derived under the Idaho Company contract. The challenge is specifically to the award of the $50,000 to Black Canyon.

Plaintiff's basic contention is that it "owns" 95.6% of the Minidoka power plant. It rests this conclusion primarily upon language used in the opinion in Wilbur v. Burley Irrigation District, supra. It asserts that this decision is res judicata upon the question of its "ownership" of 95.6% of the plant. As a corollary, plaintiff says that by adjudication of the state and federal courts in Idaho 2700 second-feet of water have become "appurtenant" to the plant for power purposes, and by reason of its ownership of 95.6% of the plant it "owns" also 95.6% of this water right. It asserts that these rights are "vested property interests" under the decision in Wilbur v. Burley Irrigation District, supra; that under that decision it is entitled to receive 95.6% of the plant's net profits, presently by credit to construction charges against lands in the district which it has assumed; that the total net profits of $119,128.78 derived from sales of power to consumers for commercial use within the project are net profits of the Minidoka plant; and that the Secretary's refusal to apportion 95.6% of this sum, including the $50,000 allocated by him to Black Canyon, is a deprivation of these allegedly vested rights. Plaintiff, in effect, asserts that the entire matter was adjudicated in Wilbur v. Burley Irrigation District, supra, and therefore the court below had no further duty or power than to give effect to that decision by granting the relief prayed. Evidence and findings made by the court with reference to matters taking place since the date of the decision are said to be irrelevant and therefore erroneously received and made.

On the other hand, the Secretary denies: that the case presents any issue of interference by his action with any vested right of the plaintiff or its constituent members; that Wilbur v. Burley Irrigation District, supra, in any way involved or concluded any issue presented here; that plaintiff "owns" 95.6% or other portion of the Minidoka plant, or of the water-right adjudicated for production of power there; or that his action in allocating the $52,-384.52 as net profits derived from the Idaho Power Company contract, or any part thereof, violated any right of plaintiff or of anyone represented by it in this litigation. On the contrary, he asserts that the allocation was made entirely in accordance with the law and the rights of all parties, as established by statute, contract and the decision in Wilbur v. Burley Irrigation District, supra; that plaintiff's suit is an effort to interfere with his authority and discretion, lawfully vested, and exercised by him as an administrative official of the Government in the performance of an exclusively administrative function; that the courts have no power to examine into or control his actions in the performance of this function; and that there is no evidence that his action was arbitrary, capricious or in bad faith. He asserts also that the court was without jurisdiction to entertain the suit: (1) because of the absence of indispensable parties, namely, the Minidoka Irrigation District and the Idaho Power Company, whose rights either under contract or otherwise will be adversely affected by the granting of any relief which the plaintiff seeks; and (2) because the suit in effect seeks to compel the United States specifically to perform its contract of March 15, 1926, with the plaintiff.

Other contentions are made by each of the parties, which we find it unnecessary to mention since they are involved, implicitly if not explicitly, in those we have stated.

The trial court, after extended hearing, made findings of fact and conclusions of law, which in general sustained the defendant's contentions. The findings included the facts substantially as we have stated them, with others, and were clearly supported by the evidence. The court disposed of the case upon the merits, declining to pass upon the jurisdictional questions, and entered its final judgment dismissing plain-

tiff's bill. We likewise find it unnecessary to consider or decide the jurisdictional issues and, as we have said, find no error in the action of the trial court.

## I.

 The court was clearly correct in holding that Wilbur v. Burley Irrigation District, supra, is not res judicata of the issues in this case. It involved only the question of the power of the Secretary, after he had once determined the ratio in which the Burley and the Minidoka districts should share the net profits of the Minidoka plant, to reconsider the original determination and establish a new ratio. It had to do only with the division of profits after they were earned, determined and announced by the Secretary, nothing to do with how they should be determined or with what constitutes net profits. This suit goes directly and solely to the latter questions. The Secretary in no way questions, in fact he concedes, the ratio established by the Wilbur decision, but says it has no application to the funds now contested. That involves the question whether these funds are profits of the plant, and no such issue was present in the Wilbur case. Nor did it determine ownership of the plant. At most it determined "ownership" of the right to receive credit for the plant's net profits in the specified percentages. These are entirely distinct matters, as distinct in fact as the well-established distinction between ownership of a business and a right to share in its profits.[9] The question here involves what should be included in the profits and whether the Secretary properly determined that the $50,000 should not be included. These are questions antecedent to and therefore distinct from any issue concerning how the profits shall be divided.

Plaintiff, however, rests its contrary argument on the view that the issue decided in the Wilbur case [61 App.D.C., 145, 58 F.2d 873], was "the ownership" of the Minidoka plant. It attempts to show this by referring to language used in the opinion stating that the Secretary's redetermination of the ratio "would amount to a readjustment of the ratio *of ownership* of the two districts *in the power plants*" and that the injuncton extended "only to the redetermination by the Secretary of the *proportionate ownership in the Minidoka power project.*" (Italics supplied) These statements followed forms of expression used by Secretaries Work and West made when they respectively determined, and denied a petition to redetermine, the ratio of profit credit.[10]

Plaintiff's emphasis on these statements ignores the fact that the court stated the issue more accurately in other portions of the opinion, particularly when it said that the injunction was to restrain the Secretary from redetermining "the ratio of *ownership and participation* * * * *in the power profits past or future* from what is known as the Minidoka irrigation project" and "the *respective property interests* that the districts have in the entire project *under their respective contracts* with the government." (Italics supplied) The two forms of statement bring into sharp contrast, in the setting of the present case though not in that of the Wilbur case, the vast difference between ownership *of the plant* and ownership of the right to receive credit for a share in the net profits produced by operation of the plant. For some purposes and in regard to some. issues, it is true, as Lord Coke's celebrated inquiry indicates, that land may be identified with its rents; and a business with the right to a share in its profits. But for others, the identification can produce only confusion and confounding of rights. For the purpose before the court in the Wilbur

---

[9] The distinction arises frequently in partnership cases, e. g.: Cox v. Hickman, 1860, 8 H.L.Cases 268; Kilshaw v. Jukes, 1863, 3 Best & Sm. 847; Burnett v. Snyder, 1879, 76 N.Y. 344; Kaufmann v. Kaufmann, 1908, 222 Pa. 58, 70 A. 956; Uniform Partnership Act §§ 6, 7(4).

[10] Secretary Work said: "As the matter now stands, *to state it simply*, the Burley District owns 95.6 per cent. of the power plant, and the Minidoka District the remainder, or 4.4 per cent.," (italics supplied) and Secretary West: "The decision of Secretary Work became, in effect, a rule of property and is entitled to all the recognition which such a consequence necessarily gives it." Both went on to say that contracts had been made by the districts on the faith of the originally determined ratios, in the one case of costs, in the other of profits. Extensive improvements had been made in reliance on these ratios, and each Secretary showed that these considerations weighed heavily in the formation of his conclusion. It does not follow that they are pertinent only on the assumption that each district "owned" the stated percentage "of the plant."

case, namely, determining whether the Secretary exhausted his power over the ratio of distribution of profits when he made the original allocation,[11] there was no fundamental error in referring to the ratio as one of "ownership of the plant" although this was inaccurate as description of the right at issue. But for the present purpose, stripping that simplified description from its context and attempting to make it conclusive here in its literal form would convert what was in those circumstances merely an immaterial inaccuracy of statement into a glaring and vital misstatement of the rights acquired and the issues presented. The legislation establishing and expanding these projects has created a highly complex system of rights and interests, some in the Government, some in the districts, some in the individual water users, which if combined in a single individual would add up to the simplified conception of "ownership" for which plaintiff appears to contend, with itself as "owner." The statutes[12] and the contract of March 15, 1926, have carefully reserved to the Government title and also the right to manage, control and operate all works not transferred pursuant to the statutory conditions, as has not been done with the Minidoka power plant. Furthermore, the conditions upon which such a transfer could be made have not been fulfilled. Neither the Secretary nor the court therefore had power legally to transfer "ownership" of the plant from the Government to the plaintiff. That the former contracted to give it credit for a share in the profits and that the latter adjudicated this limited, and contingent,[13] right to be beyond the jurisdiction of the Secretary to modify, did not and was not intended to transfer "ownership" of the plant to the plaintiff. In view of these facts, we cannot construe the court's decision as confirming or accomplishing what neither the Secretary nor we had power to do.

Nor is it necessary so to construe it in order to give it full effect. We may recognize fully its assertion that the right acquired by plaintiff under the contract was "a property right," "a vested interest," "a vested right," even that it was a "vested interest in the plant." We need not recognize that right as "ownership of the plant" or regard the decision as establishing such ownership in the plaintiff. The right which was "vested," which plaintiff "owned," was the right to receive credit, in accordance with the contract, for 95.6% of the net profits of the plant as determined and announced by the Secretary. Plaintiff's fallacy is in the failure to differentiate that right, which it owned, from "ownership of the plant." Wilbur v. Burley Irrigation District, supra, did not adjudicate ownership of the Minidoka plant and is not res judicata of that issue here.

## II.

From what has been said concerning the issue of res judicata, it is unnecessary to discuss further plaintiff's contention that it has become the "owner" of 95.6% of the Minidoka power plant and of the 2700 second-feet of water adjudicated to the United States for production of power at that plant. The United States remains the owner of the plant, the water right and the business, as it has been from the beginning, because these properties have not been transferred to the districts, and the conditions upon which transfer might be made have either not been prescribed by Congress or not been fulfilled. Inasmuch as plaintiff rests its case primarily upon the contention of ownership, rejection of that contention perhaps makes consideration of other issues unnecessary.

But we think the claim of "ownership" of the plant and the water right contains implicitly, if not indeed explicitly, the assertion that the Secretary had no authority or power to stop the winter flow of water through the Minidoka plant, to cease pro-

---

[11] "The acts of 1924 and 1926 (44 Stat. 481), under which Secretary Work proceeded, specifically prescribed that his decision should be conclusive and final. It is clear, therefore, that any attempt on the part of the present Secretary to revise, modify, or change *these contracts* is an interference with property rights already vested; a matter over which the jurisdiction of the Secretary no longer exists." 61 App.D.C. 147, 148, 58 F.2d 873 (loc. cit.). (Italics supplied)

[12] Cf. notes 1, 3, 4 supra and Subdivision I quoted above.

[13] Plaintiff's right and those of its constituent water users are subject to termination in case of default in payment of construction charges and assessments against the lands in the district. That the profits have been more than sufficient to pay these as they accrue does not remove either the legal or the factual possibility that they may not be so in the future and that forfeiture may occur.

ducing power there in the nonirrigating season, or perhaps to enter into the contract for supplemental power with the Idaho Power Company. Certainly it includes the assertion that the Secretary had no authority to credit the $50,000 to the Black Canyon plant. It is true that plaintiff disclaims intention to question or interfere with defendant's operation of the plant or to ask for specific performance of its contract with the United States of March 15, 1926. It does not assert, in so many words, that the Secretary has no discretionary power to stop the winter flow and cease generating power in that season in order to conserve the water for irrigating uses, or that he could not enter lawfully into the contract with the Idaho Power Company. But it does claim that, having done so, he must give it credit for 95.6% of the $50,000 which has been credited to the Black Canyon plant. It says this sum is part of the profits produced by the Minidoka plant, that it is entitled to receive 95.6% of it, and that the Secretary has no lawful right or authority to credit it or any part of it to the Black Canyon plant. While not denying defendant's power to conserve water by the cessation of winter flow, when in his judgment that is necessary for the benefit of the plaintiff and its constituent water users, it asserts he cannot do so in order to conserve water for use outside the district or by persons whose adjudicated appropriations are subsequent to that made for power at the Minidoka plant, except by condemnation proceedings and with full compensation, payable to the plaintiff, for the water of which it says it is thereby, in effect, deprived. This assumes, of course, that the water conserved is to be used only for the benefit of others than the plaintiff; that it is the owner of a right to have the winter flow continued in order that power may be generated for commercial sale; that continuance of winter flow would create a profit; and that defendant by his action has deprived it of that right, or of its equivalent, namely, the proceeds from sales of power brought in from the outside and sold "to replace" that which would have been generated had the plant been operated. Plaintiff also attacks the allocation by a lengthy and involved attempt to show that the Government was "fully compensated" for its Black Canyon power delivered to the Idaho Company, by the considerations received by it from the company under their contract, and that therefore the Government or the Black Canyon plant is not entitled to receive credit for this $50,000.

Cutting through the mass of indirection, we think these contentions actually raise the question whether the Secretary has exceeded his authority in operating the plant and determining its net profits for 1935. They amount to a charge that his action has been arbitrary. The trial court rightly determined that it was not so and that he had full power lawfully to execute the so-called plan of conservation.

■ The crux of the matter is in the findings that execution of the plan was essential for the plaintiff's benefit, both to supply the necessary power for pumping and to preserve and maintain the commercial power business. These findings were supported amply by the evidence. They show that "no successful commercial power business could have been carried on during the year 1935 or any of the succeeding years without the power brought in from outside sources and delivered to the Minidoka Project by the Idaho Power Company"; that the demand for power for irrigation, mainly in the Burley District, "absorbed the entire power output and entire power capacity of the Minidoka power plant during the summer and left no surplus power whatever available from that source during the peak of the irrigation season to carry on the growing commercial, domestic and industrial power business of the Minidoka Project"; that "firm" power was required to operate that business, could not be produced by the Minidoka plant whether or not the winter flow was allowed to continue, and was available only from sources outside the project; and that the plan adopted by the Secretary resulted not only in saving about 250,000 acre-feet of water for irrigation, including expanding requirements of the Burley District, but also "in saving and preserving the profitable commercial power business on the Minidoka Project, which would otherwise have been lost through lack of a dependable source of power during the irrigation season." [14]

In the face of these findings, there can be no question that the Secretary's action in placing the plan into effect was essential (1) to fulfill plaintiff's requirements for power for irrigation and (2) to preserve the commercial business, without which .

---

[14] Numerous other findings supported these, which it is not necessary to include or summarize here.

there would have been no profits to share. In these circumstances he had lawful authority to stop the flow of winter water and cease generating winter power at the plant. In view of the necessity of this action for the protection and preservation of plaintiff's interests, it is immaterial that some of the water thereby saved might become available also for irrigating uses by persons holding rights in appropriations subsequent to that decreed for power purposes at the Minidoka plant. The Secretary, in common parlance, simply "killed two birds with one stone." That others also may have been benefited does not nullify the benefit to plaintiff and in fact was entirely consistent with the economical use of water which the prior appropriator always must make for the benefit of subsequent ones. [15] Clearly action which was essential to the preservation of both plaintiff's primary and its secondary interests in the use of water could not be arbitrary.

It remains to consider whether, conceding that the Secretary had lawful authority to conserve the winter flow and enter into the Idaho Company contract, it was arbitrary or in abuse of his discretion to credit the $50,000 to the Black Canyon plant. We agree with the trial court not only that this was entirely within his discretion, but that it was exercised properly, if not in fact as required by law.

Plaintiff contends that the power received from Black Canyon through the exchange with the Idaho Company was merely "replacement" power to take the place of that not generated at Minidoka in the winter. Therefore, it says, since it would have been entitled to credit for 95.6% of the profits which would have been earned if the plant had been operated, it should receive the same proportion of the profits which were made by the sale of the "replacing" power.

The argument almost amounts to asserting that plaintiff has an unqualified right to have the winter flow used to generate power for commercial sale, a view we have shown to be fallacious. But, further, it ignores the fact that the power brought in was not merely to replace that not generated at Minidoka. The latter was only seasonal and, as shown by the findings, when not supplemented by outside power, incapable of producing a profit. The power brought in was "firm" power. It replaced that not generated at Minidoka in the winter, but, more importantly, it supplied all of the power required to maintain the commercial business when the entire Minidoka output was required for irrigation pumping or failed during emergencies. Had the power brought in been merely "replacement" of that which might have been generated in winter at Minidoka, it could not have preserved the commercial business (other than the unprofitable sale for heating) and there would have been no commercial profits for plaintiff to share. The power brought in augmented the plant's summer capacity and it was this which preserved the commercial business. To this fact, therefore, the commercial profits must be attributed. The Secretary no doubt had authority to bring in power from outside the project to augment its inadequate capacity, but nothing in the statutes or the contract with plaintiff required him to do so, or to give the benefit of such action to those interested in the project without cost to them.

Plaintiff's contention that the Government was adequately compensated for the Black Canyon power under its contract with the Idaho Company, even if true, would be no basis for holding that plaintiff is entitled to have the benefit of that power, or its sale, without charge. That might be true only if the power were brought in and sold as a substitute for power which plaintiff was entitled to have generated at Minidoka and sold. As has already been shown, plaintiff had no such right and the power brought from the outside was not such power.

We need not decide whether the Secretary, in his management of the Black

[15] Whether the Secretary, by virtue of his discretionary powers of management and the statute's specific direction against disposition of surplus power for commercial use so as to impair the efficiency of the irrigation project, could have stopped the winter flow and generation of power, without providing supplemental power from outside, we need not decide. It would seem that the statute's clear mandate would subordinate the commercial uses of power to those of irrigation in any case where the two uses might be in conflict, and therefore, whatever might be the case with an appropriation of water for power purposes unqualified by conditions attached by federal law, the Secretary, quite apart from considerations regarding preservation of the power business, was following out the statutory command.

Canyon plant, was required by law to allocate to it, from the proceeds of sale of the power brought in to the Minidoka project, the cost of the power delivered by Black Canyon to the Idaho Company. The contract with the company, and that with the Minidoka District, show that from the beginning it was contemplated that at least $50,000 should be applied from proceeds of sale of the power delivered by the Idaho Company under the contract to reimburse the Black Canyon plant for the power delivered by it to the company. The contract with the company contained provisions for its termination by the Secretary in case judicial decision should make this impossible. The contract was merely one phase or incident in the entire plan of conservation and the Secretary evidently considered the right to allocate the $50,000 to Black Canyon of sufficient importance to justify making not only the contract but the plan as a whole contingent for their execution upon his ability to make that credit. Plaintiff is not a party to that contract, though it has been benefited greatly by it. It therefore has no right to challenge it, or to require that it be segregated for present purposes from its setting in the plan as a whole. Nor is it a matter of any concern to the plaintiff whether the Government's bargain with the Idaho Company was a good or a bad one. The only

question which concerns it is whether the Secretary, in his discretionary functions as manager of the Black Canyon and Minidoka plants, had lawful authority to credit the $50,000 to Black Canyon, and not to plaintiff to the extent of 95.6%. Plaintiff has shown no sufficient reason to support the view that it, or the Minidoka District, or the consumers of commercial power, should receive the benefit of this power without charge. We think it was clearly within the Secretary's discretion, if not also perhaps required by law, that he allocate the $50,000 to Black Canyon.

In so ruling we need not determine whether that sum should be considered as an operating expense of the business conducted in connection with the Minidoka power plant or as operating expense of an entirely separate and distinct business of distributing commercial power from Black Canyon in the Minidoka District.[16] In either event it would not be net profits "derived from the *operation* of project power *plants*" (here Minidoka) within the meaning of Subsection I or of the contract of March 15, 1926. The funds in question were not derived from the operation of the Minidoka *plant*. It is only net profits so derived which plaintiff is entitled to share.

We find it unnecessary to consider the jurisdictional or other arguments advanced.

The judgment is affirmed.

---

[16] The $50,000 may be regarded in either of two ways: (1) as created by operation of the contracts of the Government with the Idaho Company and the Minidoka District, and thus in effect of a system or business of distributing power separate and distinct from that of distributing power produced by operation of the Minidoka plant; (2) as an operating expense of the business conducted in connection with the Minidoka plant, not a profit produced by the operation of that plant. The situation may be regarded as involving the operation by the Secretary of two distinct businesses, one in the sale of power generated by operation of the Minidoka plant, and the other in the sale of power received from the Black Canyon plant, each producing its own profits; or as involving only a single business in the sale of all the power, whether generated at Minidoka or received under the Idaho Company contract.