**CITY OF VANCEBURG, KENTUCKY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent (two cases).**

**Nos. 76–1755 and 76–1756.**

United States Court of Appeals, District of Columbia Circuit.

Argued 3 Oct. 1977.

Decided 28 Nov. 1977.

Rehearing Denied Dec. 22, 1978.

James F. Falco, Washington, D. C., with whom Philip P. Ardery, Louisville, Ky., and Marlow W. Cook, Washington, D. C., were on the brief, for petitioner.

McNeill Watkins, II, Atty., Federal Energy Regulatory Commission, Washington, D. C., for respondent. Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel, Allan Abbot Tuttle, Sol., and Thomas M. Walsh, Atty., Federal Energy Regulatory Commission, Washington, D. C., were on the brief, for respondent.

Before BAZELON, Chief Judge, and TAMM and WILKEY, Circuit Judges.

Opinion for the Court filed by WILKEY, Circuit Judge.

WILKEY, Circuit Judge:

Petitioner, the City of Vanceburg, Kentucky, ("Vanceburg") here seeks review of orders issued by the Federal Energy Regulatory Commission ("Commission") granting Vanceburg licenses to construct hydroelectric powerhouses at each of two Government navigation dams on the Ohio River and assessing against Vanceburg substan-

tial annual rental charges for the use of these two dams. Petitioner contends that the charges assessed in these orders are excessive, unreasonable, and hence unlawful. After careful analysis of the pertinent provisions of the Federal Power Act ("the Act"),[1] the legislative history, and the relevant authorities, we conclude that Petitioner's contentions are either untimely or not well founded. We therefore affirm the Commission.

The controversy in this case centers on the method by which the Commission calculated the charges assessed in the orders; it is necessary to understand these calculations to apprehend the issues raised. Therefore in the ensuing discussion, we must describe these computations in some detail.

## I. BACKGROUND

### A. *Statutory Framework*

One of the main purposes of the Federal Water Power Act of 1920, which became Part I of the Federal Power Act in 1935, is to encourage the development of hydroelectric power. Section 4(e) of the Act[2] em-

---

1. 16 U.S.C. §§ 791a–823.

2. 16 U.S.C. § 797(e):

 The Commission is authorized and empowered—

 (e) *To issue licenses* to citizens of the United States, or to any association of such citizens, or to any corporation organized under the laws of the United States or any State thereof, or to *any State or municipality* for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, or upon any part of the public lands and reservations of the United States (including the Territories), *or for the purpose of utilizing the surplus water or water power from any Government dam*, except as herein provided: *Provided*, That licenses shall be issued within any reservation

 only after a finding by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservations: *Provided further*, That no license affecting the navigable capacity of any navigable waters of the United States shall be issued until the plans of the dam or other structures affecting the navigation have been approved by the Chief of Engineers and the Secretary of the Army. Whenever the contemplated improvement is, in the judgment of the Commission, desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, a finding to that effect shall be made by the Commission and shall become a part of the records of the Commission: *Provided further*, That in case the Commission shall find that any Government dam may be advantageously used by the United States for public purposes in addi-

powers the Commission to issue licenses to corporations [3] or municipalities [4] authorizing the construction and operation of generating and transmission facilities using surplus water or water power from existing Federal dams.

Section 10 of the Act imposes several conditions on the issuance of such licenses.[5] Two of these conditions are pertinent in this case: under Section 10(a), a proposed project must be *economically feasible*; under Section 10(e), a licensee must pay a *reasonable annual charge* for use of the Government dam. Around these two separate, but in some respects interrelated, considerations the issues in this case revolve.

Section 10(a) provides that the licenses are issued on the condition— [6]

(a) *That the project adopted*, including the maps, plans, and specifications, *shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan* for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, *for the improvement and utilization of water-power development*, and for other beneficial public uses, including recreational purposes; and if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval.

One factor considered by the Commission in judging whether a proposed project is "best adapted to a comprehensive scheme of . . . water power development" is the economic feasibility of the project.[7] The Commission's economic feasibility analysis generally has two parts. First, the Commission determines whether there is an adequate market for the power to be generated by a project; second, the Commission determines whether the estimated cost of developing a project is significantly lower than the estimated cost of developing suitable alternative sources.

Section 10(e) provides that licenses are issued on the condition— [8]

(e) *That the licensee shall pay to the United States reasonable annual charges in an amount to be fixed by the Commission* for the purpose of reimbursing the United States for the costs of the administration of this subchapter; *for recompensing it for the use, occupancy, and enjoyment of its lands or other property*; and for the expropriation to the Government of excessive profits until the respective States shall make provision for preventing excessive profits or for the expropriation thereof to themselves, or until the period of amortization as herein provided is reached, and in fixing such charges the Commission *shall seek to avoid increasing the price to the consum-*

tion to navigation, no license therefor shall be issued until two years after it shall have reported to Congress the facts and conditions relating thereto, except that this provision shall not apply to any Government dam constructed prior to June 10, 1920: *And provided further*, That upon the filing of any application for a license which has not been preceded by a preliminary permit under subsection (f) of this section, notice shall be given and published as required by the proviso of said subsection. (emphasis added).

3. 16 U.S.C. § 796(3):

(3) "corporation" means any corporation, joint-stock company, partnership, association, business trust, organized group of persons, whether incorporated or not, or a receiver or receivers, trustee or trustees of any of the foregoing. It shall not include "municipalities" as hereinafter defined;

4. 16 U.S.C. § 796(7):

(7) "municipality" means a city, county, irrigation district, drainage district, or other political subdivision or agency of a State competent under the laws thereof to carry on the business of developing, transmitting, utilizing, or distributing power;

5. 16 U.S.C. § 803.

6. 16 U.S.C. § 803(a) (emphasis added).

7. *See, e. g., Pacific Gas & Electric Co.*, 2 F.P.C. 300 (1940); *Fresno Irrigation District, Pacific Gas & Electric Co.*, 8 F.P.C. 348, 353–55 (1949). *See also, Municipal Elec. Ass'n of Mass. v. FPC*, 134 U.S.App.D.C. 310, 414 F.2d 1206 (1969).

8. 16 U.S.C. § 803(e) (emphasis added).

ers of power by such charges, and any such charges may be adjusted from time to time by the Commission as conditions may require: *Provided*, That *when licenses are issued involving the use of Government dams* or other structures owned by the United States or tribal lands embraced within Indian reservations *the Commission shall*, subject to the approval of the Secretary of the Interior in the case of such dams or structures in reclamation projects and, in the case of such tribal lands, subject to the approval of the Indian tribe having jurisdiction of such lands as provided in section 476 of Title 25, *fix a reasonable annual charge for the use thereof*, and such charges may with like approval be readjusted by the Commission at the end of twenty years after the project is available for service and at periods of not less than ten years thereafter upon notice and opportunity for hearing: *Provided further*, That licenses for the development, transmission, or distribution of power by States or municipalities shall be issued and enjoyed without charge to the extent such power is sold to the public without profit or is used by such State or municipality for State or municipal purposes, except that as to projects constructed or to be constructed by States or municipalities primarily designed to provide or improve navigation, licenses therefor shall be issued without charge; and that licenses for the development, transmission, or distribution of power for domestic, mining, or other beneficial use in projects of not more than two thousand horsepower installed capacity may be issued without charge, except on tribal lands within Indian reservations; *but in no case shall a license be issued free of charge for the development and utilization of power created by any Government dam and that the amount charged therefor in any*

license shall be such as determined by the Commission. In the event an overpayment of any charge due under this section shall be made by a licensee, the Commission is authorized to allow a credit for such overpayment when charges are due for any subsequent period.

Under this provision, the Commission assesses three types of charges against corporate or municipal licensees authorized to use water power from existing Federal dams. First, annual charges are assessed to reimburse the United States for the costs of administering Part I of the Federal Power Act.[9] Second, annual charges are assessed to recompense the United States for the licensee's use, occupancy or enjoyment of Federal lands or other property (other than lands adjoining or pertaining to Government dams or other Government structures).[10] These two kinds of charges are not at issue in this case. Third, annual charges are assessed to compensate the United States for the use of Government dams or other structures owned by the United States, and for use of Federal lands adjoining such dams or structures. The charges at issue in this case are of this latter "dam-use" type.

Dam-use charges are governed by the Commission's regulations at 18 C.F.R. 11.22 which read in part:

> Reasonable annual charges for recompensing the United States for the use of Government dams or other structures owned by the United States, and for the use, occupancy, and enjoyment of the lands of the United States adjoining or pertaining thereto, will be *based upon the estimated value for power purposes* of the properties and privileges for which a license is issued. . . . (emphasis added).

One method commonly used by the Commission to compute these dam-use charges is called the "sharing-of-net-benefits meth-

9. These charges are governed by 18 C.F.R. 11.20.

10. These charges are governed by 18 C.F.R. 11.21.

od."[11] In *Alabama Power Co.*,[12] the Commission described the four step process which this formula involves. First, the licensee's annual cost of operating the proposed hydroelectric project is determined. Second, the annual cost of operating the least expensive (fossil fuel) alternative for producing equivalent energy is estimated. Third, the net benefit accruing to the licensee from use of the Government dam is computed by subtracting the former costs from the latter. Fourth, the licensee is assessed as an annual fee an amount equal to one-half of the difference between the former and the latter cost, thereby sharing equally between the United States and the licensee the net annual benefit resulting from use of the Government dam.[13]

### B. Factual and Procedural History

#### 1. Vanceburg's License Applications

The City of Vanceburg, Kentucky, a "municipality" within the meaning of the Federal Power Act,[14] has been engaged in a program to attract industry to its area. In order to obtain sources of low-cost electrical energy both for industrial consumers and area residents, Vanceburg sought licenses under Section 4(e) of the Act for two separate hydroelectric power projects at exist-ing Government navigation dams on the Ohio River: (1) the Cannelton Project No. 2245,[15] and (2) the Greenup Project No. 2614.[16]

The proposed Cannelton Project was to be constructed in Hancock County, Kentucky, at the Army Corps of Engineers' Cannelton Locks and Dam. The proposed Greenup Project was to be constructed in Scioto County, Ohio, at the Army Corps of Engineers' Greenup Locks and Dam. For each project, Vanceburg proposed the construction of a powerhouse containing three hydroelectric units with a total installed capacity of 70,560 kW (70.56 MW). Both proposed powerhouses were to utilize surplus water or water power from their respective Government dams.

#### 2. The Commission's 29 March 1976 Orders

On 29 March 1976 the Commission issued two separate orders granting Vanceburg licenses for the two proposed projects.[17]

Pursuant to Section 10(a) of the Act, the Commission determined that each of the proposed projects was "economically feasible." This determination was based in part on a costing study which compared the projected annual costs of operating the pro-

---

11. *See, e. g.*, Order Modifying and Adopting Initial Decision of Presiding Examiner and Examiner's Further Decision Upon Reopened Hearing, *The Montana Power Co.*, Project No. 5, 25 F.P.C. 221 (1961), *rehearing denied* by order issued 24 March 1961, *affirmed, The Montana Power Co. v. FPC*, 298 F.2d 335 (D.C. Cir. 1962); *Alabama Power Co.*, 36 F.P.C. 659 (1966). *See also, Public Service Co. of Indiana, Inc.*, 25 F.P.C. 1065 (1961); *Ohio Power Co.*, 50 F.P.C. 2020 (1973).

12. 36 F.P.C. 659, 660 (1966).

13. Thus, hypothetically, if the licensee's projected annual cost of operating the proposed hydroelectric plant is $3,000,000, and if the projected annual cost of operating a fossil fuel plant for producing equivalent energy is $4,000,000, then the "net benefit" accruing to the licensee from use of the Government dam is $1,000,000, and the annual dam-use charge would be $500,000 under the sharing-of-net-benefits method.

14. 16 U.S.C. § 796(7).

15. For the Cannelton Project No. 2245, Vanceburg is a successor license applicant to Harrison County Rural Electric Membership Corporation ("HREMC"), an Indiana corporation, that had been issued a preliminary permit on 1 October 1958, and had subsequently applied for a license on 7 September 1961. On 8 September 1971, the Commission authorized the substitution of Vanceburg for HREMC as license applicant for the project.

16. For the Greenup Project No. 2614, Vanceburg is an original license applicant. On 28 July 1966 it applied for a preliminary permit for the project, and this issued on 3 November 1967. On 12 December 1969 it applied for the project license.

17. Order Issuing License (Major) and Dismissing Application for Preliminary Permit, Project Nos. 2614 and 2704, issued 29 March 1976; Order Issuing License (Major), Project No. 2245, issued 29 March 1976. These orders are reproduced at Joint Appendix (J.A.) 52–90 and 1–21 respectively.

posed projects with the estimated annual costs of operating a hypothetical steam plant alternative. The order granting a license for the Cannelton Project stated: [18]

Based on our studies, a fossil fueled steam-electric generating facility, which is the least expensive alternative energy source, could provide capacity and energy equivalent to that estimated to be generated at the project, at an annual cost of $4,457,700. The annual cost of producing power from the project is estimated to be $3,970,300. In light of the facts that the estimated cost of producing power from the project is less than the estimated cost of producing an equivalent amount of power from a suitable alternative and that an adequate market for the power has been demonstrated, we conclude that the project is feasible from an economic standpoint.

Similarly, the order granting a license for the Greenup Project stated: [19]

Based on our studies, a fossil fueled steam-electric generating facility, which is the least expensive alternative energy source, could provide capacity and energy equivalent to that estimated to be generated at the project at an annual cost of $4,418,800. The annual cost of producing power from the project is estimated to be $3,963,000. In light of the facts that the estimated cost of producing power from the project is less than the estimated cost of producing an equivalent amount of power from a suitable alternative and that an adequate market for the power

has been demonstrated, we conclude that the project is feasible from an economic standpoint.

In addition, as required by Section 10(e) of the Act, each order assessed annual charges against Vanceburg for the cost of administration, the use of Federal land, and the use of a Government navigation dam.[20] These latter dam-use charges were computed according to the sharing-of-net-benefits method. The Commission subtracted the estimated annual cost of operating each hydroelectric project from the estimated annual cost of operating the least expensive alternative, thereby computing the "net benefit" accruing to the licensee from use of each of the Government dams, and then assessed against Vanceburg as annual dam-use charges one half of each net benefit. *In computing these charges, the Commission employed the same cost figures that it had used in determining the economic feasibility of the respective projects*—whence arises this controversy. It set forth in detail these computations in an appendix to each order.[21]

With respect to the Cannelton Project No. 2245, the Commission assessed an annual dam-use charge of $243,700. The Commission's full calculations are set forth and explained in the margin,[22] but, briefly, this figure was arrived at as follows:

Step 1. Estimate annual cost of operating Cannelton hydro-electric project _____ $3,970,300

---

**18.** J.A. 9.

**19.** J.A. 63.

**20.** J.A. 21; 89.

**21.** J.A. 22; 91. The appendix for the order licensing the Cannelton Project is reproduced in note 22.

**22.** "Appendix A" to the Commission's 29 March 1976 order licensing the Cannelton Project reads as follows (J.A. 22):

APPENDIX A

Computation of Net Power Benefits. Cannelton Project No. 2245

1. Cannelton Hydroelectric Project No. 2245

Installed Capacity 70.56 MW
Est. Average Annual Generation 340 GWh
Est. Dependable Capacity 32.5 MW

Step 2. Estimate annual cost of operating hypothetical steam plant alternative _ _ _ _ _ _ _ _ _ _ _ $4,457,700

Step 3. Calculate net benefit accruing to licensee Vanceburg ($4,457,700—$3,970,300) _ _ _ _ $ 487,400

Step 4. Assess one half of net benefit as annual charge _ _ _ _ $ 243,700 ·

With respect to the Greenup Project No. 2614, the Commission assessed an annual dam-use charge of $227,900. The Commission's calculations closely paralleled those made for the Cannelton Project: [23]

Step 1. Estimate annual cost of operating Greenup hydroelectric project _ _ _ _ _ _ _ _ _ _ _ _ $3,963,000

Estimated Capital Cost, 1/75 $33,914,000
Est. Power Supplied to U.S. Government

Energy — 0.648 GWh
Capacity — 0.394 MW

Estimated Annual Cost

| | |
|---|---|
| Fixed (33,914) (.1126) | $3,818,700 |
| O & M & A & G | 146,000 |
| FPC Annual Charge | 5,600 |
| Total | $3,970,300 |

2. Steam Electric Plant Alternative
(2–500 MW Units w. Cooling Towers)

| Estimated Capital Cost (1/75) | $/kW |
|---|---|
| Steam Plant | 363.74 |
| Transmission | 49.70 |
| Total | 413.44 |

| Estimated Annual Cost | |
|---|---|
| Fixed ($413.44) x 0.1181 | 48.83 |
| O & M & A & G | 2.63 |
| Fuel, fixed & inventory | 4.72 |
| Total | 56.18 |

| Estimated Variable Cost | |
|---|---|
| | 7.91 mills/kWh |

3. Estimated Annual Value

| | | |
|---|---|---|
| Capacity [1] (31,960–394) kW x $56.18/kW | = | $1,773,400 |
| Energy (340,000–648) MWh x $7.91/MWh | = | $2,684,300 |
| Total | | $4,457,700 |

4. Estimated Net Power Benefit
$4,457,700—$3,970,300 = $487,400

[1] $\dfrac{\text{Hydro adjustment}}{\text{dependable capacity}}$ x $\dfrac{\text{probability of meeting load-hydro}}{\text{probability of meeting load-steam}}$ $32{,}500 \times \dfrac{0.87771}{0.89257} = 31{,}960$

These computations were not fully explained to the Court either in the briefs or at oral argument. However, as we understand them, the Commission arrived at an estimated annual cost for operating the hydroelectric project by determining that the licensee would be required to pay the capital cost of the project ($33,914,000) at an annual rate of 11.26%. In other words, the Commission estimated that each year the licensee would pay as fixed costs 11.26% of $33,914,000. The 11.26% included fixed charge rates of 10.80% for cost of money,

0.06% for amortization, 0.20% for interim replacements, 0.10% for insurance and 0.10% for miscellaneous tax. (J.A. 114). Similarly, the Commission determined that the annual fixed cost of operating the hypothetical steam plant alternative would be 11.81% of the estimated capital cost of the project. Other costs, such as maintenance costs, were then added to these fixed costs, determining the total annual operating costs for each kind of project.

**23.** J.A. 91.

Step 2. Estimate annual cost
of operating hypothetical steam
plant alternative _____ $4,418,800

Step 3. Calculate net benefit
accruing to licensee Vanceburg
($4,418,800—$3,963,000) ____ $ 455,800

Step 4. Assess one half of net
benefit as annual charge ____ $ 227,900

In sum, then, the Commission's 29 March 1976 orders granting licenses to Vanceburg for the two proposed hydroelectric projects were based on a costing study which calculated the cost differential between the proposed hydroelectric projects, on the one hand, and steam plant alternatives on the other. The costing study arrived at cost differential figures of $487,400 and $455,800 for the Cannelton and Greenup projects respectively. These figures theoretically represented the cost savings which the licensee would achieve from using the government dams, and they were used by the Commission for two purposes: first, to ascertain the economic feasibility of the projects under Section 10(a) of the Act; and second, to serve as the basis for computing annual dam-use charges under Section 10(e) of the Act.

### 3. Vanceburg's Applications for Rehearing

Disputing the validity of the dam-use charges assessed in the Commission's 29 March 1976 licensing orders, Vanceburg filed with the Commission, on 29 April and 14 May 1976 respectively, applications and supplemental applications for rehearing.[24] In its supplemental applications, Vanceburg contended that the assessed charges were unlawful because they were computed in a way which improperly deprived Vanceburg of the advantage of being a tax-exempt municipality.[25]

Specifically, Vanceburg pointed out that in computing the net benefits, from which the dam-use charges were derived, the Commission had not included any income tax cost in estimating either the annual costs of operating the proposed hydroelectric projects or the annual costs of operating the hypothetical steam plant alternatives. The Commission had excluded such costs because its costing studies were based on "real costs," that is, costs which would actually be incurred by a licensee, and Vanceburg, by virtue of its tax-exempt status, would not in fact incur income tax costs in operating either the hydroelectric or fossil fuel plants.

However, Vanceburg observed that an investor-owned utility, in the same position as Vanceburg, would incur annual income tax costs in operating the hydroelectric or steam plants, and it estimated that these annual tax costs would be equal to about 2% of the estimated capital costs of the plants. Vanceburg then demonstrated that if the dam-use charges were recomputed according to the sharing-of-net-benefits method with the 2% tax factor included as part of the annual costs of the proposed hydroelectric projects and the steam plant alternatives—as it would be for an investor-owned utility—then the cost differentials between the comparative projects were substantially reduced, and, therefore, the annual charges were significantly lower. These results were illustrated in appendices to

---

24. J.A. 37; 39; 106; 108.

25. J.A. 39; 108. In its applications, Vanceburg also requested an exemption from annual charges to the extent power was to be used for municipal purposes under the second proviso of Section 10(e). This request was premature. Under Commission regulations, such requests are to be made once the project begins generating power. These requests must be filed annually and must be accompanied by adequate supporting information. See, 18 C.F.R. § 11.24. In its "Orders on Rehearing", the Commission thus found that this exemption request was not properly before it. J.A. 45. Vanceburg has not challenged this conclusion in the instant appeal.

Vanceburg's supplemental rehearing applications. One of these appendices is set forth in the margin,[26] but the following table reflects their significant features:

26. The Appendix to Vanceburg's supplemental application for rehearing on the Commission's

Cannelton licensing order (J.A. 41) reads as follows:

### EXAMPLE OF CALCULATION TO ILLUSTRATE EFFECT OF INCOME TAXES ON NET POWER BENEFITS

#### Computation of Net Power Benefits, Cannelton Project No. 2245

| | | Appendix A to Order | Calculation Using 2% Annual Cost to Represent Effect to Income Taxes |
|---|---|---|---|
| 1. Cannelton Project No. 2245 | | | |

Installed Capacity 70.56 MW
Est. Average Annual Generation 340 GWh
Est. Dependable Capacity 32.5 MW
Estimated Capital Cost, 1/75 $33,914,000
Est. Power Supplied to U.S. Government

Energy — 0.648 GWh
Capacity — 0.394 MW

Estimated Annual Cost

| | Appendix A to Order | | Calculation Using 2% |
|---|---|---|---|
| Fixed (33,914) (.1126) | $3,818,700 | x 0.1326 | $4,497,000 |
| O & M & A & G | 146,000 | | 146,000 |
| FPC Annual Charge | 5,600 | | 5,600 |
| Total | $3,970,300 | | $4,648,600 |

2. Steam Electric Plant Alternative

(2–500 MW Units w. Cooling Towers)

| Estimated Capital Cost (1/75) | $/kW |
|---|---|
| Steam Plant | 363.74 |
| Transmission | 49.70 |
| Total | 413.44 |

Estimated Annual Cost

| | | | |
|---|---|---|---|
| Fixed ($413.44) x 0.1181 | 48.83 | x 0.1381 | 57.10 |
| O & M & A & G | 2.63 | | 2.63 |
| Fuel, fixed & inventory | 4.72 | | 4.72 |
| Total | 56.18 | | 64.45 |

Estimated Variable Cost 7.91 mills/kWh

3. Estimated Annual Value

Capacity [1] (31,960–394) kW x $56.18/kW = $1,773,400 x $64.45 = $3,034,400
Energy (340,000–648) MWh x $7.91/MWh = $2,684,300 = $2,684,300
 Total 4,457,700 $4,718,700

4. Estimated Net Power Benefit

$4,457,700 — $3,970,300 = $487,400

$4,718,700 — $4,648,600 = $ 70,100

[1] $\dfrac{\text{Hydro adjustment}}{\text{dependable capacity}}$ x $\dfrac{\text{probability of meeting load-hydro}}{\text{probability of meeting load-steam}}$ 32,500 x $\dfrac{0.87771}{0.89257}$ = 31,960

The significant figures are doubly underlined. By adding hypothetical income tax costs to the Commission's fixed charge rates, Vanceburg has raised those rates by 2%—from 11.26% to 13.26% for the hydroelectric project and from 11.81% to 13.81% for the steam plant alternative. Using these higher fixed charge rates increases the annual fixed costs for both the hydroelectric project and the steam plant alternative. However, the higher fixed charge rates produce a much greater increase in the cost of the hydroelectric project than they do in the steam plant alternative. This is so because, in the case of the hydroelectric project, the fixed charge rate of 13.26% is multiplied by the whole estimated annual cost figure of $33,914,-000; whereas, in the case of the steam plant, it appears that the impact of the higher fixed

Thus, in the right-hand column, where a tax cost is included as it would be for an investor-owned utility, the cost savings or "net benefits" to be shared are only $70,100 and $80,800, yielding annual charges of $35,050 and $40,400 respectively. However, in the left-hand column, where no tax cost is included, as it was not in the Commission's licensing order on account of Vanceburg's tax-exempt status, the cost savings or "net benefits" to be shared are substantially increased to $487,400 and $455,800, yielding annual charges of $243,700 and $277,900 respectively.

Acknowledging that as a municipality it would not actually incur tax costs, Vanceburg argued, nevertheless, that the Commission was required to include imaginary tax costs in its computations in order to measure properly the benefits, in the form of cost savings, actually accruing to Vanceburg from the use of Government dams. *Vanceburg contended that the exceedingly high net benefit figures achieved by excluding tax costs did not represent cost savings accruing to Vanceburg from the use of Government dams, but rather represented mainly tax savings conferred on Vanceburg by Federal and state tax statutes.* Thus, in Vanceburg's view, the tax savings which resulted from its tax-exempt status were not part of the cost savings, or "net bene-

| | | Calculations Used in 29 March Orders—No Tax Cost Included | Calculations Using 2% Annual Cost to Represent Income Tax Effect |
|---|---|---|---|
| A. | Cannelton Project: | | |
| 1. | Estimated Annual Cost of Proposed Hydroelectic Project: | $3,970,300 | $4,648,600 |
| 2. | Estimated Annual Cost of Hypothetical Steam Plant Alternative: | $4,457,700 | $4,718,700 |
| 3. | Net Benefit: | $ 487,400 | $ 70,100 |
| 4. | Annual Charge: | $ 243,700 | $ 35,050 |
| B. | Greenup Project | | |
| 1. | Estimated Annual Cost of Proposed Hydroelectic Project: | $3,963,000 | $4,639,900 |
| 2. | Estimated Annual Cost of Hypothetical Steam Plant Alternative: | $4,418,800 | $4,720,700 |
| 3. | Net Benefit: | $ 455,800 | $ 80,800 |
| 4. | Annual Charge: | $ 227,900 | $ 40,400 |

charge rate of 13.81% is lessened by the presence of a substantial constant in both the Commission's and Vanceburg's valuation of the annual costs. This constant is represented by the figure $2,684,300 for "Energy" in step "3" of the calculations.

We do not understand the distinction between "Capacity" and "Energy" in step "3", and, therefore, we do not understand what this constant represents. However, neither party contests this portion of the calculation, and we have no reason to doubt its validity. Nor do we think these particular details are necessary to an understanding of the case. The important point is that the higher fixed charge rates of 13.26% and 13.81% increase the costs for the hydroelectric project more than they do the costs of the steam plant, and this has the effect of reducing the cost gap between the two kinds of projects.

fit," derived from the dams and, therefore, could not be "shared" by the Government. By excluding tax costs, Vanceburg asserted, the Commission was unlawfully attempting to write itself in on these substantial tax savings.

Stating that it would lose the advantage of being a municipality unless the Commission included imaginary tax costs in its dam-use charge calculations, Vanceburg concluded its supplemental rehearing applications by praying that the Commission recalculate the charges, "giving Vanceburg full advantage of its municipality status." [27]

#### 4. The Commission's Orders on Rehearing and the Instant Appeal

On 27 May 1976 the Commission issued orders granting rehearings for the purpose of considering the issues raised by Vanceburg in its applications and supplemental applications.

In Orders on Rehearing issued 21 June 1976 [28] the Commission addressed the issues raised by Vanceburg and rejected on several grounds Vanceburg's contention that the Commission's failure to include imaginary tax costs in computing dam-use charges improperly deprived Vanceburg of its tax-exempt status.

First, the Commission stated that it would be "anomalous" to consider Vanceburg's tax exempt status when determining the economic feasibility of a project, a treatment which benefits Vanceburg by magnifying the projected cost savings; but then to ignore Vanceburg's tax-exempt status, and treat Vanceburg as an investor-owned utility when computing annual charges. [29]

Second, the Commission stated that, in order to be reasonable, dam-use charges must be based upon the real status of each specific licensee and that "to treat Vanceburg as an investor-owned utility for the purpose of computing annual charges is to give substance to a fiction." [30]

Finally, the Commission noted that the assessed annual charges did not nullify Vanceburg's tax exemption, but merely required Vanceburg to exchange part of its tax savings for the benefit of using a Government dam. It concluded that the sharing-of-net-benefits method was properly applied in this case and that it uniformly required all licensees, tax-exempt or not, to pay one half of the value to them of using Federal property. [31]

The Orders on Rehearing thus concluded that Vanceburg had failed to present any facts or legal arguments that required any modification of the Commission's licensing order of 29 March 1976. [32] These appeals followed and were consolidated by order of this court on 14 September 1976.

#### II. THE ISSUES

In its petition for review before this Court, Vanceburg challenges the lawfulness of the dam-use charges assessed in the Commission's 29 March 1976 orders on essentially three grounds.

First, Vanceburg contends that the formula employed by the Commission in computing the assessed charges was not the proper sharing-of-net-benefits method because (a) it used the same costing data developed in the economic feasibility studies, [33] (b) it determined the "gross" benefits rather than the "net" benefits, [34] and (c) it

---

**27.** J.A. 40; 109.

**28.** "Order on Rehearing, Project No. 2245," issued 21 June 1976, supplemented 3 August 1976 (Cannelton), reproduced at J.A. 43–51; 113–114. "Order on Rehearing, Project Nos. 2614 and 2704," issued 21 June 1976, supplemented 3 August 1976 (Greenup), reproduced at J.A. 112; 113–114.

**29.** J.A. 50.

**30.** *Id.*

**31.** *Id.*

**32.** *Id* at 51.

**33.** *See* Brief of Petitioner, 18.

**34.** *Id.* at 19–20.

arbitrarily apportioned the benefits on a 50%-50% basis.[35]

Second, Vanceburg argues that the assessed dam-use charges include tax savings conferred on Vanceburg by Federal and state tax laws, and, to the extent that the charges include such tax savings, they are unauthorized by the Federal Power Act, unreasonable, and "possibly" unconstitutional.[36]

Finally, Vanceburg asserts that the assessed charges are unauthorized by the Federal Power Act to the extent they exceed the charges which would be assessed an investor-owned utility, in the same position as Vanceburg, because higher charges discriminate against municipalities and, thereby, frustrate the purpose of the Act by deterring municipalities from developing hydroelectric power.[37]

We conclude that Vanceburg's first contention is not timely and that its second and third contentions are not meritorious.

### A. Vanceburg's Contention Regarding the Commission's Failure Properly to Use Net Benefits Formula

■ We need not analyze at length Vanceburg's argument that the Commission did not properly employ the sharing-of-net-benefits method, for it was not timely made.

■ Section 313(b) of the Federal Power Act provides that any party aggrieved by an order of the Commission may seek review in this court.[38] However, the statute further provides that no objection to an order of the Commission may be considered on review unless the same objection was first *specifically* raised in an application for rehearing directed to the Commission.[39] As

the Supreme Court has stated, it is the purpose of this provision to give the Commission notice of its alleged errors so that it may have the opportunity to correct them.[40] This provision reflects the principle that one must exhaust administrative remedies before resorting to judicial review.[41] This court has consistently adhered to this requirement.[42]

Vanceburg's contention concerning the Commission's improper application of the sharing-of-net-benefits method, was not "specifically" set forth in Vanceburg's applications for rehearing, original or supplemental, as required by Section 313(a) of the Act; nor was it even raised implicitly in these filings. There is simply nothing in Vanceburg's applications which could be expected to call the Commission's attention to this alleged error. Indeed, with the exception of the treatment of tax costs, Vanceburg implicitly approved the Commission's methodology by requesting the Commission to recalculate the dam-use charges according to its formula but using a 2% tax factor.[43] We find, therefore, that this issue has not been timely raised, and this court may not now consider it on appeal.

### B. Vanceburg's Contention Regarding the Commission's Treatment of Income Tax Costs in Computing Dam-Use Charges

The second, and most substantial, objection to the dam-use charges raised by Vanceburg in this appeal is the same one it urged before the Commission in its supplemental applications for rehearing. Essentially, Vanceburg argues that the Federal Power Act does not authorize the Commission, in computing dam-use charges for a

---

**35.** *Id.* 24.

**36.** *Id.* 25–38.

**37.** *Id.* 38–50.

**38.** 16 U.S.C. § 825*l* (b).

**39.** 16 U.S.C. § 825*l* (a) and (b).

**40.** *FPC v. Colorado Interstate Gas Co.,* 348 U.S. 492, 498, 75 S.Ct. 467, 99 L.Ed. 583 (1955). *See also State of North Carolina v. FPC,* 174 U.S.

App.D.C. 475, 533 F.2d 702, 705 (1976); *Rhode Island Consumers Council v. FPC,* 164 U.S. App.D.C. 134, 504 F.2d 203, 212 (1974).

**41.** *FPC v. Colorado Interstate Gas Co.,* 348 U.S. 492, 75 S.Ct. 467, 99 L.Ed. 583 (1955).

**42.** *See, e. g.,* cases cited at note 40 *supra.*

**43.** J.A. 40; 109.

tax-exempt municipality, to consider the magnifying effect which the municipality's non-payment of taxes has on the cost savings which the municipality will derive from use of a Government dam. Moreover, Vanceburg argues that by treating tax savings as part of the cost savings accruing to it from the use of Government dams, the Commission is levying a tax on Vanceburg—a tax which is unauthorized by the Federal Power Act and violative of the doctrine of intergovernmental tax immunity.

We have carefully considered the language of Section 10(e) of the Act, the legislative history of that provision, and the relevant authorities and have concluded that the dam-use charges assessed thereunder are "fees" and not "taxes"; *that the Commission is authorized to base such fees on the actual value of the benefit bestowed on the specific licensee*; and that, in measuring the actual value of such benefit, *the Commission may consider real costs, including real tax costs.*

### 1. *Section 10(e); A System of Compensatory Fees*

In its Orders of Rehearing and on this appeal, the Commission has argued that it would be "anomalous" to consider Vanceburg's tax exempt status when determining the economic feasibility of the project (a treatment which magnifies the prospective cost savings and thus favors Vanceburg and its application), but then to ignore Vanceburg's tax-exempt status when determining annual charges (a treatment which reduces the prospective cost savings and thus benefits Vanceburg by lowering the charges). The contention seems to be that for the sake of consistency, the calculations used in determining economic feasibility *must* also be used in computing annual charges. However, this does not *necessarily* follow. Section 10(a) and Section 10(e) have distinct purposes. The object under Section 10(a) is to calculate the real cost savings which would result from the hydroelectric project.

The object under Section 10(e) is to compute *reasonable* annual charges for the use of government dams. Thus, the validity of a particular set of charges must be ascertained by reference to the terms of Section 10(e), not to the terms of Section 10(a). In this case the Commission has used the real cost savings calculated under 10(a) as the basis for charges under 10(e). The issue presented, therefore, is precisely whether this was an appropriate basis for the charges assessed. This issue can only be resolved through careful analysis of the Commission's mandate under Section 10(e).

Section 10(e) of the Act clearly authorizes the Commission to exact certain charges from those granted licenses to use water power from Government dams. The theory behind such charges is that, by issuing the license, the Government has conferred a benefit on the licensee. However, this provision does not confer on the Commission unlimited discretion to levy any charge it sees fit regardless of the value of the benefit conferred on the licensee. Section 10(e) was not intended to be a general revenue-raising statute. The language of the Section expressly states that the licensee shall pay the Government annual charges for the purpose of "*recompensing* it for the use, occupancy and enjoyment of its lands or other property,"[44] and, adverting specifically to the use of Government dams, it states that the Commission shall fix annual charges "for the use thereof."[45] We view this language as evidencing Congress' intent that charges assessed for the use of Government dams should be compensatory in nature. Thus, Section 10(e), as we read it, establishes a system of compensation; dam-use charges are to be levied for the purpose of compensating the Government for the benefit it has conferred on the licensee. The concept behind compensation is that the charge exacted should be equivalent, or at least proportionate to, the value of the benefit conferred.

---

44. 16 U.S.C. § 803(e) (emphasis added).

45. *Id.*

644

In *National Cable Television v. United States*,[46] the Supreme Court made a distinction between "taxes" and "fees": [47]

> Taxation is a legislative function, and Congress, which is the sole organ for levying taxes, may act arbitrarily and disregard benefits bestowed by the Government on a taxpayer and go solely on ability to pay, based on property or income. A fee, however, is incident to a voluntary act, *e. g.*, a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society. . . . A "fee" connotes a "benefit" . . . .

It is clear that the dam-use charges under Section 10(e) are not "taxes" but "fees." [48] They are charges exacted against a licensee in exchange for a privilege which the licensee has requested or applied for and from which the licensee derives a special benefit. Our analysis above, however, indicates that Section 10(e) dam-use charges are not just "fees"; they are compensatory fees, and as such they must be proportionate to the value of the benefit for which they are exchanged.

To this point, we have relied solely on the statutory language itself in construing Section 10(e) as establishing a system of compensatory fees. However, the legislative history of Section 10(e) strongly supports our interpretation. During Congressional consideration of the Water Power Act of 1920, the matter of appropriate charges for hydroelectric project licenses was a central issue between the House and Senate. In the debates, a distinction was made between the case in which the licensee is granted permission to use water or water power from an existing Federal dam, on the one hand, and the case in which the licensee is merely granted permission to build from scratch its own dam for power purposes on a navigable waterway. In the former case, there appears to have been agreement between the House and Senate that compensatory charges were appropriate, for there was no question but that a substantial benefit was flowing from the Government to the licensee.[49] In the latter case, however, there was disagreement between the House and Senate as to the propriety of charges. The Senate took the position that, in such a case, there was no real benefit flowing from the Government to the licensee for which the Government could justly exact compensation, for in its view, the water rights were vested in the States and the Federal interest was only in protecting and controlling navigation.[50] This view was cogently stated by Senator Nelson during the floor debates: [51]

> There are two classes of dams. Where a dam is constructed by the Federal

**46.** 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974).

**47.** *Id.* at 340–41, 94 S.Ct. at 1149. (footnote omitted). *See also FPC v. New England Power Co.*, 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974).

**48.** Vanceburg contends that the charges required by the Commission's orders are unconstitutional taxes which violate the doctrine of intergovernmental tax immunity. In making that argument Vanceburg ignores the fact that the charges under Section 10(e) are not taxes but user fees. As a sovereign the Government levies taxes, but as a property owner it may charge fees for the use of its property. Acting as the Government's agent, pursuant to Section 10(e), the Commission sets and collects fees for the use of Government property. These fees are paid *by choice and in exchange for a particular benefit*, the use of specific Government property, just as rents are freely paid for the use of private property. Taxes, in contrast, are imposed by the sovereign without regard to choice or particular benefit. Consequently, we believe Vanceburg's position that the contested charges are unconstitutional taxes is untenable. *Cf., National Cable Television v. U. S.*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974); *FPC v. New England Power Co.*, 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974).

**49.** *See, e. g.*, 59 Cong.Rec. 1041 (1919–1920) (remarks by Senator Nelson); *Id.* at 1100–01 (remarks by Senator Lenroot).

**50.** *See, e. g., Id.* at 1039–42; 1571–72.

**51.** *Id.* at 1041 (remarks by Senator Nelson) (emphasis added).

Government for purposes of navigation, and there is a surplus power to be disposed of that ought to be utilized, in that case the Federal Government having constructed the dam, and by the construction of it having created a water power, *manifestly the Government is entitled to full compensation for the use of that power.* But where the Government has simply issued a license to a man, giving him permission to build a dam with his own money, his own capital, his own resources; in that case I have always believed, and that has been the view of the majority of the Senate, that the Government is not fairly and equitably entitled to any pay for the use of the water. If any compensation is to be made for the use of the water, it belongs to the States or to the riparian owners.

The House, however, took the position that where Congress grants a right to obstruct navigation it has the right to impose as a condition such charges as it deems fit.[52]

Reflecting this philosophy, the House version of the Water Power Act conferred virtually unlimited authority on the Commission to exact charges from licensees under Section 10(e). It read simply that licenses were issued on the condition[53]

(e) That the licensee shall pay to the United States reasonable annual charges in an amount to be fixed by the commission.

The Senate criticized this provision in its report: [54]

One substantial amendment relates to the power given the commission to impose charges upon the licensee to put in power development works. The House provision reads as follows:

'That the licensee shall pay to the United States reasonable annual charges in an amount to be fixed by the commission.'

Whether the charge is to be for Government land used, for the mere granting of the permit, or for something else is not stated. It is practically a grant of unlimited power to the commission to levy such tax as it sees fit to impose, and, while the charge must be reasonable, there is no rate laid down upon which its reasonableness is to be determined. It is a blanket power to tax that should be given to no administrative body.

The Senate adopted a version which attempted, first, to ensure that all charges under Section 10(e) would be limited to the purpose of reimbursing the Government for costs it incurred or compensating the Government for some property right or privilege from which the licensee derived a special benefit, and, second, to set a ceiling on the charges which could be exacted. The Senate's language read: [55]

That the licensee shall pay for the license herein granted such reasonable annual charges as may be fixed by the commission *for the purpose of reimbursing the United States* for the cost of administration of the act in relation to water powers developed under its jurisdiction, in the proportion that the water power developed by the project covered by said license bears to the total water power developed by all projects licensed under the act, and for that purpose such charges may be readjusted from time to time, not oftener than once in two years; *the licensee shall also pay for the use, and occupation of any public lands* and lands in reservations, except tribal lands embraced within Indian reservations, necessary for the development of the project covered by the license such reasonable annual charges *based upon the actual value of the Government lands used* as may be fixed by the commission; but in no event shall the annual charge for the foregoing exceed 25 cents per developed

52. *See, e. g., Id.* at 6524 (remarks by Mr. Esch).

53. H.R. 3184, 66th Cong., 1 Sess., § 10(e) (1919), quoted at 59 Cong.Rec. 6524 (1920).

54. S.Rep. No. 180, 66th Cong., 1st Sess. 1–2 (1919).

55. *See,* 59 Cong.Rec. 1572, (1920) (emphasis added).

horsepower: *Provided,* That *when licenses are issued involving the use of Government dams or other structures owned by the United States,* or tribal lands embraced within Indian reservations *the commission shall fix a reasonable annual charge for the use thereof* and such charges may be readjusted at the end of 20 years after the beginning of operations and at periods of not less than 10 years thereafter in a manner to be described in each license.

The conferees did not accept in full either the Senate or House provisions in their report, but recommended a substitute. The compromise was adopted and is reflected in the existing statute.[56] Although the Senate did not succeed in placing ceilings on charges, the present provision does reflect the Senate's view that charges should be compensatory in nature and, hence, proportionate to the value of the benefit conferred.

### 2. *Valuation of Benefits Under Section 10(e).*

Because compensatory fees must be proportionate to the value of the benefit conferred, the valuation of the benefit is an essential predicate to fixing proper charges for the use of a Government dam under Section 10(e). Methods of valuation, of course, must vary with the nature of the benefit under consideration, for there are many ways in which the value of a particular benefit can be measured. The cost to the benefactor, the value to the beneficiary, the market or replacement value—all of these are appropriate measures of value in certain circumstances.

Section 10(e) requires the Commission to make valuations for several different kinds of benefits. For example, the Commission must fix charges to recompense the Government for any occupancy of its lands. In the absence of special circumstances, one might

suspect a national average rental value to be an appropriate measure of the benefits conferred on the licensee through occupancy of the land, and the Commission has recognized this in its regulations.[57] However, Section 10(e) also calls upon the Commission to make more difficult valuations. For example, as in the instant case, it is required to place some value on a licensee's use of water from a dam. Here, the Commission is not seeking to measure the benefit derived from occupancy of a fungible tract of real estate; rather, it is required to measure the value of the licensee's "use" of the water from a specific dam.[58] Moreover, it is not the value of the use for *any purpose* that the Commission must ascertain, but the value of use for a *particular purpose,* namely, generating electric-power.[59]

The central issue presented in this case by Vanceburg's claim really concerns the problem of valuation. It is this: what is the proper basis for dam-use charges under Section 10(e)—is it the *actual* value of dam use for power purposes *to each specific licensee,* public or private, as the Commission contends, or is it a more general standard such as the value of dam use for power purposes *to the average investor-owned utility in the region,* as Vanceburg contends?

The Commission's interpretation that Section 10(e) authorizes dam-use charges based on the actual value of dam use to the specific licensee is a reasonable one, and as such is entitled to great weight.[60] We find nothing in the Act which militates against this construction. Moreover, we believe that this interpretation is most consistent with the notion of compensation in that each licensee is to be charged in direct proportion to the fiscal benefit it actually receives. When Congress has failed to provide a formula for the Commission to follow, a court is not war-

**56.** *See, Id.* at 6519–21; 6524.

**57.** 18 C.F.R. 11.21(b).

**58.** 16 U.S.C. § 803(e).

**59.** *Cf., Montana Power Co. v. FPC,* 112 U.S. App.D.C. 7, 298 F.2d 335 (1962). *See also,* 18 C.F.R. 11.22.

**60.** *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

ranted in rejecting the one which the Commission employs unless it plainly contravenes the statutory scheme of regulation.[61] Therefore, we conclude that a proper basis for dam use charges under Section 10(e) is the actual value of dam use to the specific licensee.

The analogy of a lease in a shopping center might serve to illustrate the arguments and position of the parties here. Assume that two similar type stores lease space identical in size and desirability of location in the same shopping center, the two stores might pay the same or different rental depending on the terms of the leases. If ABC Stores and XYZ Shops each have a lease under which the rental is calculated at a percentage of gross sales, and ABC's dollar volume is twice that of XYZ's, then ABC will pay twice the rent of XYZ. This would be justified on the basis that the benefit conferred on ABC by occupancy of the space is twice the benefit conferred on XYZ. This is the Commission's argument here.

On the other hand, ABC might anticipate this situation developing, and argue during negotiation with the shopping center that its greater sales volume will be due to superior salesmanship, better products, a larger expenditure on advertising, a longer established reputation in that community, etc., and that a flat fee rental only should be charged. This is the argument of Vanceburg here, i. e., its tax exempt municipality status enables it to achieve a much greater saving from hydro power instead of fossil fuel, compared to that achieved by an investor-owned taxpaying utility, hence it should pay only a flat fee comparable to that charged private utilities.

There is nothing inherently right or wrong, fair or unfair, with either method of calculating rentals. In the commercial example, the rental formula negotiated will be determined by the commercial negotiating strength of the parties. In our case here, the Commission has a discretion with-

in the statute in fixing "reasonable annual charges", and thus conceivably might use any one of several methods in calculating the charge, actual value of dam use to the specific licensee being one of them.

▮ Tax costs are *real* costs and tax savings are *real* savings, and we find nothing in Section 10(e) or in the other provisions of the Water Power Act which precludes the Commission from considering tax costs and tax savings in ascertaining the real value of a dam-use license to a specific licensee. We do not believe that the Commission need close its eyes to tax consequences in order to effectuate the policies of the Water Power Act; nor do we believe that the Commission's consideration of tax consequences frustrates the policies of the Internal Revenue Code. In short, Vanceburg's exemption from federal income tax under Section 115(a) of the Internal Revenue Code does not exempt it from paying compensatory fees under Section 10(e) of the Federal Power Act.

▮ Finally, we do not suggest that the Commission is free automatically to assess as charges the full amount of the value conferred on a licensee. Section 10(e) sets a maximum and a minimum charge, and directs the Commission to exercise its discretion and expert judgment in fixing a "reasonable" charge somewhere within this range. The maximum charge is the fully compensatory charge represented by the full value, or "net benefit," of the dam-use license. The second proviso of Section 10(e) sets the minimum charge: ". . . but in no case shall a license be issued free of charge" for use of a Government dam.[62] Within this range, the Commission must set a reasonable charge by considering all relevant factors and arriving at a charge which minimizes consumer costs, encourages power development, but at the same time, compensates the Government to some extent for the benefit it has conferred on the licensee. This appears to be precisely what the Commission has done in the instant case.

---

**61.** *Cf. Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 589–91, 65 S.Ct. 829, 89 L.Ed. 1206 (1944).

**62.** 16 U.S.C. § 803(e).

The sharing-of-net-benefits formula, it seems strikes a balance which satisfies the statutory requirements that the general public be reasonably compensated by a licensee for its use of a particular Government dam, while at the same time minimizing consumer costs and encouraging power development by providing licensees with net benefits equal to the annual charge.

C. *Vanceburg's Contention Regarding the Discriminatory Impact of the Assessed Charges*

Vanceburg's third and final contention, raised inferentially in its supplemental applications for rehearing, is that the tax-exempt utility will always pay higher annual dam-use charges than a similarly situated investor-owned utility under the sharing-of-net-benefits method unless a hypothetical tax liability is imputed to it.[63] Therefore, Vanceburg asserts, "[t]he charges thus assessed by the Commission that result in a prohibited discrimination against a class of licensees must, necessarily, be 'unreasonable' charges. . . ."[64] Such "discriminatory" charges, Vanceburg argues further, deter State and municipal participation in water-power development and, thereby, frustrate the policy of the Federal Power Act.[65]

 Annual charges for the use of Government dams fixed under Section 10(e) of the Act are the product of the expert judgment of the Commission. The Commission has a range of discretion in fixing such charges so that it may balance all the relevant factors, including the impact of charges on consumer costs, the compensation of the Government, and the course of power development.[66] A licensee challenging the reasonableness of annual dam-use charges carries the heavy burden of making

a convincing showing that the charges are unreasonable or otherwise unauthorized.[67] Vanceburg has simply not met this burden with respect to its contention that the assessed charges are to have a discriminatory or deterrent impact. Vanceburg has not undertaken to explain precisely in what way the charges at issue are discriminatory. This court is confronted only with an unsupported assertion that the charges are "necessarily" discriminatory. Without further elucidation by petitioner, we simply do not understand how this could be so. Merely because charges for municipal licensees are significantly higher than those assessed for similarly situated investor-owned licensees *does not necessarily* mean that municipalities are discriminated against. Charges which are proportionate to the actual value of the benefit conferred on a licensee are not discriminatory. If one class of licensees derives greater benefits from its licenses than another class of licensees, there is no discrimination when the first class is required to pay higher charges than the second. The net benefits formula measures the actual benefit conferred upon a licensee, whether public or private, and provides for an equitable sharing of the benefits by the licensee and the Government. *All licensees* receive net benefits after the Government fee equal to the annual charges, and Vanceburg is no exception. Its charges are higher than an investor-owned utility's would be, but it receives an equally greater benefit from its license.

Similarly, Vanceburg has not provided any support for its contention that the assessed charges deter municipalities from developing water power; nor do we see how this deterrent effect could exist. Under the sharing-of-net-benefits formula only one half of the cost savings resulting from the

---

63. Vanceburg points specifically to the fact that the charges assessed against it are substantially higher than any previous charge assessed against a licensee: "No annual charge ever assessed by the Commission ever exceeded two and one-half times *less* than the charges levied against Vanceburg." Brief of Petitioner, 40.

64. Brief of Petitioner, 43.

65. *Id.* 43.

66. See discussion in text at pages ——————of 187 U.S.App.D.C., 647–648 of 571 F.2d.

67. *Cf. FPC v. Hope Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

hydroelectric option would be assessed as charges. This means that there are still substantial cost advantages in pursuing that option, cost advantages equivalent to the charges themselves. Indeed, higher charges signify that the particular user finds greater advantages to hydroelectric development.

Finding, as we do, Vanceburg's challenges to the dam-use charges assessed by the Commission to be either untimely or not well founded, we affirm the Commission's orders of 29 March and 21 June 1976.