EAST COLUMBIA BASIN IRRIGATION DISTRICT, Quincy–Columbia Basin Irrigation District, South Columbia Basin Irrigation District, City of Tacoma and City of Seattle, City Light Department, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

Nos. 84–1001, 84–1003 and 85–1852.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 12, 1988.

Decided Sept. 10, 1991.

As Amended Oct. 29, 1991.

McNeil Watkins II, Washington, D.C., for petitioners.

Joshua Z. Rokach, Atty., F.E.R.C., with whom Catherine C. Cook, General Counsel, and Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., were on the brief, for respondent. John H. Conway, Atty., F.E.R.C., Washington, D.C., also entered an appearance for respondent.

Before D.H. GINSBURG and BOGGS,* Circuit Judges, and SPOTTSWOOD W. ROBINSON, III, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge SPOTTSWOOD W. ROBINSON, III.

* Of the United States Court of Appeals for the Sixth Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a).

SPOTTSWOOD W. ROBINSON, III,
Senior Circuit Judge:

Petitioners, a consortium of three irrigation districts (the Districts) and two cities (the Cities), contest orders of the Federal Energy Regulatory Commission imposing charges for the privilege of constructing and operating hydroelectric power plants at three locations within the Columbia Basin Project, a federal reclamation area in the State of Washington. These orders were predicated on Section 10(e) of the Federal Power Act,[1] which provides for payment of reasonable annual charges to compensate the Federal Government for uses of its properties. The questions presented for our decision are whether the Districts had already done so by remittances under preexisting irrigation contracts with the Department of the Interior and, if not, whether the Commission acted arbitrarily in denying petitioners' requests for a waiver of the charges. We perceive no reason to disturb the Commission's action, and accordingly affirm.

## I. THE BACKGROUND

### A. *The Contracts With the Government*

The Government owns, and through the Department of the Interior manages, the Columbia Basin Project, an area developed under the federal reclamation laws and special authorizing statutes. Among the project's installations are extensive irrigation works which are adaptable for use in connection with the generation of hydroelectric power.

Three Columbia Basin irrigation districts[2] have long availed themselves of the agricultural opportunities offered by the project. For nearly 40 years, by virtue of agreements with the Department of the Interior, their members have cultivated lands which are dependent upon the project for irrigation. In 1945, the Government, acting through the Department and its Bureau of Reclamation,[3] undertook the construction, maintenance and operation of the facilities needed for irrigation, and the Districts pledged to reimburse the Government for the expense of maintenance and operation, and to pay a specified portion of the cost of construction. The Government, however, reserved the right to build and operate hydroelectric facilities, and to retain the revenues from the use thereof and the disposal of energy derived therefrom.[4] The first irrigation water was delivered in the early 1950's, and the arrangement endured until 1968. During this period, the Districts paid $96.4 million to the Government for project costs that were allocated to them for irrigation.

In 1968, contract renegotiations culminated in new agreements.[5] The Districts assumed full responsibility for the maintenance and operation of the irrigation system,[6] and for the payment to a maximum of nearly $149 million toward the expense of constructing the system. In return, the Districts acquired the right, subject to approval by the Secretary of the Interior, to build their own plants and associated facilities for production of hydroelectric power.[7]

1. Act of June 10, 1920, chap. 285, § 10(e), 41 Stat. 1063, 1069 (codified as amended at 16 U.S.C. § 803(e)(1) (1988)), quoted in relevant part at note 52 *infra* [hereinafter cited as codified].

2. The three districts are the East, South, and Quincy–Columbia Basin Irrigation Districts.

3. The Bureau is a unit of the Department.

4. Article 33 of the 1945 contracts preserved for the Government exclusivity in the development of the hydroelectric potential of the project, and provided that "[a]ll revenues from the use of the power plants" it constructed as part of the project, including any plant utilizing the irrigation system, "and from the use, sale or other disposal of power and energy in any form shall

be and remain the property of the United States." Joint Appendix (J.App.) 73.

5. The three Districts entered into separate but substantially identical contracts.

6. The expense thereof exceeded $10 million in 1980.

7. Article 55(a) of the 1968 contracts was substantially identical to Article 33 of the 1945 contracts. See note 4 *supra*. Article 55(b) of the 1968 contracts provided:

With the prior approval of the Secretary, the District either alone or in conjunction with the other districts, may build plants for the production of power and energy and

The contracts specified that these, and as well all revenues from sales and other dispositions of this power, were to become the property of the Districts.[8]

### B. *The Proceedings Before the Commission*

About a decade later, the Districts moved to exploit the hydroelectric power potential of the Columbia Basin Project. Their plan was to build three plants, harness and utilize surplus irrigation water for the generation of power and to sell the entire output of two of the plants to the Cities of Seattle and Tacoma, Washington. Since the Districts wished to erect the plants on project lands and to utilize the overflow from project dams, they applied to the Commission for the licenses necessary.

The Commission's Office of Electric Power Regulation granted the licenses,[9] but each contained a provision requiring payment of an annual charge.[10] The basis asserted for these charges was the call made by Section 10(e) of the Federal Power Act for "reasonable annual charges ... for the purpose of reimbursing the United States for [its] costs ... [and] for recom-

pensing it for the use, occupancy, and enjoyment of its lands or other property."[11] The licenses provided that charges would sometimes be levied subject to a stated maximum,[12] and that the exact amounts thereof would later be determined in accordance with Commission regulations yet to be promulgated.[13]

From the three licensing orders, the Districts prosecuted two appeals to the Commission.[14] Their primary contention was that the 1968 contracts with the Department of the Interior, which purported to confer upon them sole ownership of "[a]ll revenue" from hydroelectric plants constructed by them, and from the output thereof,[15] precluded the Commission from assessing charges pursuant to Section 10(e). The Commission disagreed; it ruled that while the federal reclamation laws governed the Columbia Basin Project, the "provisions of the reclamation laws and Section 10(e) of the Federal Power Act represent separate and distinct legislative schemes,"[16] and thus that the Department of the Interior lacked authority to dispense with the demands of Section 10(e).[17]

> structures and facilities necessary for the operation of such plants and all such plants shall be and remain in the exclusive control, possession and ownership of the district or districts. All revenue from such power-plants and from the use, sale, or the disposal of power energy therefrom shall be and remain the property of the District or districts.
> J.App. 74.

8. See note 7 *supra.*

9. *East Columbia Basin Irrigation Dist.,* 16 F.E.R.C. ¶ 62,242 (1981) (order issuing license) [hereinafter *License Order I*]; *East Columbia Basin Irrigation Dist.,* 17 F.E.R.C. ¶ 62,239 (1981) (order issuing license) [hereinafter *License Order II*]; *South Columbia Basin Irrigation Dist.,* 20 F.E.R.C. ¶ 62,505 (1982) (order issuing license) [hereinafter *License Order III*].

10. *License Order I, supra* note 9, 16 F.E.R.C. at 63,461–63,462; *License Order II, supra* note 9, 17 F.E.R.C. at 63,402; *License Order III, supra* note 9, 20 F.E.R.C. at 63,851.

11. As amended, 16 U.S.C. § 803(e) (1988).

12. See *License Order I, supra* note 9, 16 F.E.R.C. at 63,462; *License Order II, supra* note 9, 17 F.E.R.C. at 63,402.

13. *License Order I, supra* note 9, 16 F.E.R.C. at 63,462; *License Order II, supra* note 9, 17 F.E.R.C. at 63,402; *License Order III, supra* note 9, 20 F.E.R.C. at 63,851. Each of the licenses stated that the Commission staff was then studying, with a view to submitting recommendations to the Commission, the matter of annual charges for uses of Government property other than lands.

14. The Cities of Seattle and Tacoma intervened in one of the appeals. The same arguments were made, and the same decisions were rendered, on the two appeals. For convenience, we treat these decisions as one.

15. See note 7 *supra.*

16. *East Columbia Basin Irrigation Dist.,* 21 F.E.R.C. ¶ 61,091 at 61,283 (1982) [hereinafter *Commission Order I*]; *East Columbia Basin Irrigation Dist.,* 22 F.E.R.C. ¶ 61,312 at 61,541 (1983) [hereinafter *Commission Order II*].

17. *Commission Order I, supra* note 16, 21 F.E.R.C. at 61,283; *Commission Order II, supra* note 16, 22 F.E.R.C. at 61,541.

Alternatively, the Districts maintained that the Commission should waive the protested charges because, they said, their remittances under the 1945 contracts with the Department had already compensated the Government adequately. The Commission responded by postponing consideration of this claim until completion of ongoing rulemaking activity pertaining to annual charges.[18] On the Districts' application for rehearing, the Commission adhered to these dispositions.[19]

The Districts, joined by the Cities, then requested review by this court.[20] In 1984, however, two significant events occurred. The Commission promulgated regulations relating to annual charges for uses of Government property,[21] and the Districts submitted to the Commission an offer of settlement. To afford an opportunity to consider the offer, we remanded the records to the Commission.[22]

The offer of settlement was essentially a proposal that the Commission relieve the Districts from annual charges, in return for which the Districts would withdraw their petitions for judicial review. In support, the Districts echoed the argument that their contractual payments for construction, operation and maintenance of the Columbia Basin irrigation system had already rewarded the Government sufficiently. The Commission again demurred, reiterating its position that "charges assessed for hydropower generation benefits con-ferred by the existence and use of Federal facilities are separate and distinct from any other payments made toward these facilities' construction or operating costs,"[23] and noting that its newly-adopted regulations placed upon licensees the burden of justifying any modification of charges.[24] The Commission concluded that the "offer of settlement provides no evidence or procedure enabling us to calculate a reasonable adjustment of charges,"[25] and accordingly rejected the offer of settlement.[26] The charges were paid under protest, and the parties are back before us.

The petitions for review present the question whether for the year 1985[27] the Districts' payments pursuant to their contracts with the Department of the Interior served also to compensate the Government, in whole or in part, as required by Section 10(e). If not, the further question is whether the Commission's refusal to waive the charges was arbitrary.

## II. THE CONTRACT PAYMENTS AND THE ANNUAL CHARGES

### A. *The Columbia Basin Project*

The project traces its ancestry to a 1935 enactment pertaining to construction and preservation of a number of federal works on the Nation's waterways and harbors.[28] That legislation authorized erection of the Grand Coulee Dam on the Columbia River "for the purpose of controlling floods, improving navigation, regulating the flow of

18. *Commission Order I, supra* note 16, 21 F.E.R.C. at 61,284; *Commission Order II, supra* note 16, 22 F.E.R.C. at 61,541. See note 13 *supra*.

19. *East Columbia Basin Irrigation Dist.,* 25 F.E.R.C. ¶ 61,177 at 61,488–61,489 (1983) [hereinafter *Order on Rehearing*].

20. *East Columbia Basin Irrigation Dist. v. FERC,* No. 84–1001 (D.C.Cir.) (filed Jan. 5, 1984); *City of Tacoma v. FERC,* No. 84–1003 (D.C.Cir.) (filed Jan. 6, 1984).

21. See 18 C.F.R. pt. 11 (1990).

22. *East Columbia Basin Irrigation Dist. v. FERC,* No. 84–1001 (D.C.Cir. July 3, 1984) (order); *City of Tacoma v. FERC,* No. 84–1003 (D.C.Cir. July 3, 1984) (order).

23. *East Columbia Basin Irrigation Dist.,* 31 F.E.R.C. ¶ 61,274 at 61,559 (1985) [hereinafter *Order Denying Offer of Settlement*].

24. *Id.* at 61,558. See Annual Charges for Use of Government Dams and Other Structures Under Part I of the Federal Power Act (Order No. 379), 49 Fed.Reg. 22,770 (1984) [hereinafter Annual Charges].

25. *Order Denying Offer of Settlement, supra* note 23, 31 F.E.R.C. at 61,559.

26. *Id.*

27. Because of an amendment to § 10(e) in 1986, the controversy is limited to the annual payment for 1985. See note 70 *infra* and accompanying text.

28. Act of Aug. 30, 1935, ch. 831, 49 Stat. 1028.

the streams of the United States, providing for storage and for the delivery of the stored waters thereof, for the reclamation of public lands and Indian reservations, and other beneficial uses, and for the generation of electric energy as a means of financially aiding and assisting such undertakings." [29] In 1943, the Columbia Basin Project Act [30] named this enterprise the Columbia Basin Project, [31] reauthorized it "as a project subject to the Reclamation Project Act of 1939," [32] and specified that its provisions, and those "of each of those two Acts" and several others "shall govern the repayment of expenditures and the construction, operation and maintenance of the works constructed as a part of the project." [33] In 1962, Congress decreed more emphatically that "[t]he Columbia Basin Project shall be governed by the Federal reclamation laws...." [34]

## B. *The Reclamation Laws*

As the Commission stated in the cases before us, "[t]he reclamation laws provide a comprehensive reclamation scheme for the examination and survey of arid and semi-arid Western United States lands for the construction and maintenance of feasible irrigation works for the storage, diversion and development of water for the reclamation of these lands." [35] In the pursuit of these objectives, the Secretary of the Interior has a major role. The Columbia Basin Project Act authorized the Secretary, "[f]or the purposes of assisting in the permanent settlement of farm families, protecting project land, and facilitating project development," [36] to administer the public lands in the project area, [37] and to enter into contracts and leases consonant therewith. [38] The Act instructed the Secretary to use his judgment in formulating contract provisions, [39] and empowered him to promulgate appropriate regulations. [40] Additionally, the Secretary may, pursuant to the general reclamation laws and subject to certain statutory conditions, "enter into contract with any legally organized irrigation district whereby such irrigation district shall agree to pay the moneys required to be paid to the United States," [41] including agreements pertaining to "the construction of irrigation works and for operation and maintenance," [42] and those "to supply water from any irrigation project system for other purposes than irrigation." [43] And "[w]henever a development of power is necessary for the irrigation of lands, under any project undertaken under the said reclamation Act, or an opportunity is afforded for the development of power under any such project, the Secretary ... is authorized to lease for a period not exceeding ten years, giving preference to municipal purposes, any surplus power or power priv-

---

29. *Id.* § 2, 49 Stat. 1039–1040.

30. Act of Mar. 10, 1943, ch. 14, 57 Stat. 14 (codified as amended at 16 U.S.C. §§ 835–835m (1988)) [hereinafter cited as codified].

31. 16 U.S.C. § 835 (1988).

32. *Id.* The legislation referred to was the Act of Aug. 4, 1939, ch. 418, 53 Stat. 1187 (codified generally as amended in scattered sections of 43 U.S.C. (1988)) [hereinafter cited as codified].

33. 16 U.S.C. § 835 (1988). Originally included in this group of governing laws were 16 U.S.C. §§ 835a to 835c–5; sections 835a, 835b, 835c–3, and 835c–5 were later repealed. Pub.L. No. 87–728, § 3, 76 Stat. 677, 678 (1962).

34. Pub.L. No. 87–728, § 3, 76 Stat. 677, 678 (1962) (codified at 16 U.S.C. § 835–1 (1988)). The "Federal reclamation laws" were the "Act of June 17, 1902," ch. 1093, 32 Stat. 388, known as the Reclamation Act (codified generally as amended at 43 U.S.C. §§ 371–600(e) (1988)),

"and all Acts amendatory thereof or supplemental thereto." 16 U.S.C. § 835–1.

35. *Commission Order I, supra* note 16, 21 F.E.R.C. at 61,283 (citations omitted). See also *Henkel v. United States,* 237 U.S. 43, 49, 35 S.Ct. 536, 539, 59 L.Ed. 831, 834 (1915).

36. 16 U.S.C. § 835c(a) (1988).

37. *Id.*

38. *Id.* § 835c(b).

39. *Id.* § 835c–4.

40. *Id.*

41. 43 U.S.C. § 511 (1988).

42. *Id.*

43. *Id.* § 521.

ilege...."[44]

## C. *The Federal Power Act*

In 1920, Congress passed the Federal Water Power Act,[45] and in it authorized the Federal Power Commission to license the construction and operation of dams and other facilities for production of hydroelectric power on public lands of the United States, and for utilization of surplus water or water power from Government dams.[46] However, Congress imposed generally the condition, among others, that the licensee recompense the Government "for the use, occupancy, and enjoyment of its lands or other property,"[47] and proclaimed that "in no case shall a license be issued free of charge for the development and utilization of power created by any Government dam."[48] The Federal Water Power Act has become a part of the Federal Power Act,[49] and the Federal Energy Regulatory Commission has succeeded to the functions that the Federal Power Commission had under the Federal Water Power Act,[50] but payment of annual charges has continued as a general though not an invariable requirement. The pertinent statutory provision long was Section 10(e) of the Federal Power Act, redesignated Section 10(e)(1) in 1986,[51] which in relevant part provides "[t]hat the licensee shall pay to the United States reasonable annual charges in an amount to be fixed by the Commission for ... recompensing it for the use, occupancy, and enjoyment of its lands or other property."[52]

## D. *The Role of Section 10(e)*

This review of the evolution of the pertinent legislation highlights the duality of federal regulatory authority in the Columbia Basin Project. The Department of the Interior oversees the project pursuant to the federal reclamation laws.[53] When the irrigation system affords opportunities for the development of power, the Secretary of the Interior gains the prerogative of leasing the privilege of doing so.[54] The Federal Energy Regulatory Commission, by virtue of the Federal Power Act, licenses the construction, operation and maintenance of dams and power-production facilities, and the utilization of surplus water and water power from federally-owned dams.[55] Section 10(e) of the Act directs the Commission to assess charges against licensees for purposes of compensating the United States for the use of its property.[56]

In *City of Vanceburg v. FERC*,[57] we had occasion to probe deeply into the purpose and effect of Section 10(e). We observed that while this provision "clearly authorizes

---

44. *Id.* § 522. See *Burley Irrigation Dist. v. Ickes*, 73 App.D.C. 23, 24–25, 116 F.2d 529, 530–531 (1940), *cert. denied*, 312 U.S. 687, 61 S.Ct. 614, 85 L.Ed. 1124 (1941).

45. Act of June 10, 1920, ch. 285, 41 Stat. 1063 (codified as amended at 16 U.S.C. § 791a–828c) (1988) [hereinafter cited as codified].

46. 16 U.S.C. § 797(e) (1988).

47. *Id.* § 803(e)(1). There are exceptions. See *id.* See also note 52 *infra*.

48. *Id.*

49. In 1935, the bulk of the Federal Water Power Act became Part I of the Federal Power Act. Act of Aug. 26, 1935, ch. 687, §§ 212, 213, 49 Stat. 803, 847, 863.

50. 42 U.S.C. § 7172(a)(1)(A) (1988).

51. See Pub.L. No. 99–495, § 9(a)(1), 100 Stat. 1243, 1252 (1986).

52. In relevant part, 16 U.S.C. § 803 (1988) provides:

All licenses issued under this subchapter shall be on the following conditions:

\* \* \* \* \* \*

(e)(1) That the licensee shall pay to the United States reasonable annual charges in an amount to be fixed by the Commission for the purpose of reimbursing the United States for the costs of the administration of this subchapter; [and] for recompensing it for the use, occupancy, and enjoyment of its lands or other property;....

53. See notes 36–43 *supra* and accompanying text.

54. See note 44 *supra* and accompanying text.

55. See text *supra* at notes 46–50.

56. See note 52 *supra* and accompanying text.

57. 187 U.S.App.D.C. 196, 571 F.2d 630 (1977), *cert. denied*, 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 108 (1978).

the Commission to exact certain charges from those granted licenses to use water power from Government dams," [58] it "does not confer on the Commission unlimited discretion to levy any charge it sees fit regardless of the value of the benefit conferred on the licensee." [59] Rather, we said, "[t]he object under Section 10(e) is to compute *reasonable* annual charges for the use of government dams"; [60] "[t]he theory behind such charges," we continued, "is that, by issuing the license, the Government has conferred a benefit on the licensee," [61] and the intent underlying Section 10(e) is "that charges assessed for the use of Government dams should be compensatory in nature." [62] Thus, as we understood Section 10(e), it "establishes a system of compensation; dam-use charges are to be levied for the purpose of compensating the Government for the benefit it has conferred on the licensee," [63] and "[t]he concept behind compensation is that the charge exacted should be equivalent, or at least proportionate to, the value of the benefit conferred." [64]

Stressing the compensatory nature that Section 10(e) charges must possess, the Districts insist that the payments they remitted pursuant to their contracts with the Department of the Interior fully recompensed the Government for the uses their hydroelectric facilities will make, and therefore that Section 10(e) does not authorize the Commission to charge more than they paid to the Department. But it is clear enough that the mere fact that the contract payments were made does not automatical-

ly foreclose the annual charges that Section 10(e) requires. As the Commission observed, "the reclamation laws and Section 10(e) of the Federal Power Act represent separate and distinct legislative schemes," [65] and it is evident that payments under the one do not necessarily serve the purpose of the other. For years the Districts have enjoyed the blessings of irrigation, for which the contracts demanded contributions toward the expense of furnishing it. Contrastingly, the Section 10(e) charge in issue here would compensate the Government for use of its properties—its lands, its dams and the water power the dams provide. None of this is to say that the contract payments never in any measure rewarded the Government for the power uses the Districts sought. It is to say, however, that the payments did not necessarily do so.

### E. The Conflict and its Resolution

■ Unavoidably, in the cases at bar, one course of governmental action must yield slightly in order to accommodate the other. The Districts' contracts purported to entitle them to *all* revenues from sales of power generated in District-owned facilities.[66] A Section 10(e) charge would, of course, reduce those revenues by the amount of the charge. We thus are confronted by the question whether to that extent Section 10(e) is to be subordinated to the consequences of an activity of the Secretary of the Interior ostensibly authorized by the reclamation laws. The Commission

**58.** *Id.* at 209, 571 F.2d at 643.

**59.** *Id.*

**60.** *Id.* (emphasis in original).

**61.** *Id.*

**62.** *Id.* We explained:
   The language of the Section expressly states that the licensee shall pay the Government annual charges for the purpose of *"recompensing* it for the use, occupancy and enjoyment of its lands or other property," and, adverting specifically to the use of Government dams, it states that the Commission shall fix annual charges "for the use thereof." We view this language as evidencing Con-

gress' intent that charges assessed for the use of Government dams should be compensatory in nature.
   *Id.* (emphasis in original).

**63.** *Id.*

**64.** *Id.*

**65.** *Commission Decision I, supra* note 16, 21 F.E.R.C. at 61,283; *Commission Decision II, supra* note 16, 22 F.E.R.C. at 61,541; see *Order on Rehearing, supra* note 19, 25 F.E.R.C. at 61,488; *Order Denying Offer of Settlement, supra* note 23, 31 F.E.R.C. at 61,559.

**66.** See text *supra* at note 8.

answered in the negative,[67] and we agree.

As the Commission observed, the Federal Power Act provides "a comprehensive regulatory scheme established for the specific purpose of centralizing in one government agency the non-federal development of hydroelectric power."[68] The text of Section 10(e) is both explicit and imperative: the licensee shall pay "charges" fixed by "the Commission," and "in no case shall a license be issued free of charge for the development and utilization of power created by any Government dam."[69] We have not been referred to anything in the Act, the reclamation laws or their legislative histories suggesting that the Secretary of the Interior can dispense with Section 10(e)'s mandate. Quite to the contrary, we have found one historical episode that indicates convincingly that only the Commission has authority to administer Section 10(e).

In 1986, after the Commission declined to remove the Districts from the operation of Section 10(e), Congress amended that section in such manner that the Districts became exempt from annual charges.[70] On this account, the Districts, which previously had paid under protest the charges assessed for calendar year 1985, petitioned the Commission for a refund. The Commission held that the amendment did not operate retroactively and accordingly denied the petition.[71] The Districts did not seek rehearing by the Commission,[72] and its ruling thus became unalterable.[73]

The importance, for present purposes, of the amendment lies in its character as an indicium of the meaning of Section 10(e) prior thereto. "[S]ubsequent legislation declaring the intent of an earlier statute," the Supreme Court has taught, "is entitled to significant weight,"[74] and here it confirms our view that the Commission alone had authority over the annual charges mandated by Section 10(e). While the Senate and Conference Committee reports state merely that the exemption for the Districts "amends the Federal Power Act,"[75] Senator Johnston, one of the managers of the bill, explained on the floor of the Senate that the bill

> would validate certain contracts entered into by the [Districts] for the construction and operation of hydroelectric projects at [government] dams. The contracts in question allow the [D]istricts to keep all revenue from [hydroelectric operations]. The complete retention of all revenues conflicts with the provisions of the Federal Power Act requiring the payment of annual charges for ... Government dams. [The bill] would make clear that the [Districts] are entitled to ... the

---

67. *Commission Decision I, supra* note 16, 21 F.E.R.C. at 61,283; *Commission Decision II, supra* note 16, 22 F.E.R.C. at 61,541; *Order on Rehearing, supra* note 23, 25 F.E.R.C. at 61,488–61,489.

68. *Commission Decision I, supra* note 16, 21 F.E.R.C. at 61,283. See also *Pacific Gas & Elec. Co. v. FERC*, 231 U.S.App.D.C. 314, 318–319, 720 F.2d 78, 82–83 (1983).

69. 16 U.S.C. § 803(e)(1) (1988).

70. The amendment added a proviso that no charge be assessed for use of a government dam or structure if, prior to January 1, 1985, the licensee and the Secretary of the Interior had entered into a contract meeting specified requirements. Pub.L. No. 99–546, tit. IV, § 401, 100 Stat. 3050, 3056 (1986) (codified at 16 U.S.C. § 803(e)(1) (1988)).

71. *East Columbia Basin Irrigation Dist.*, 39 F.E.R.C. ¶ 61,122 at 61,477 (1987).

72. See Federal Power Act, § 313, as amended, 16 U.S.C. § 825*l* (1988).

73. *Id.; FPC v. Colorado Interstate Gas Co.*, 348 U.S. 492, 498–499, 75 S.Ct. 467, 471, 99 L.Ed. 583, 591–592 (1955); *City of Vanceburg v. FERC, supra* note 57, 187 U.S.App.D.C. at 208, 571 F.2d at 642.

74. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134, 143 (1974). See also *May Dep't Stores Co. v. Smith*, 572 F.2d 1275, 1277–1278 (8th Cir.), *cert. denied*, 439 U.S. 837, 99 S.Ct. 122, 58 L.Ed.2d 134 (1978); *Russ v. Wilkins*, 624 F.2d 914, 924–925 (9th Cir.1980), *cert. denied*, 451 U.S. 908, 101 S.Ct.1976, 68 L.Ed.2d 296 (1981).

75. S.Rep. No. 99–265, 99th Cong., 2d Sess. 15, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5096, 5107; H.R.Conf.Rep. No. 99–991, 99th Cong., 2d Sess. 14, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5133, 5158–5159.

benefit of their bargain with the Federal Government.[76]

In this manner, Congress resolved the conflict between Section 10(e) and the Districts' contracts. It did so by changing existing law, thus reflecting its view that prior thereto only the Commission could have dealt with the matter of annual charges. That interpretation remains intact save only to the extent that the amendment may operate retroactively, a question we have no need to decide. At least for the Districts, the amendment is wholly prospective because they did not contest the Commission's holding to that effect.[77] We hold accordingly that the Commission had ample authority to assess dam-use charges against the Districts for 1985, notwithstanding the provisions of their contracts with the Department of the Interior.

## III. THE REFUSAL TO WAIVE

### A. The Commission's Regulations

■ Since Section 10(e) does not mention waiver of annual charges as such, the situation before us obviously is not one in which "Congress has directly spoken to the precise question at issue."[78] The section does forbid issuance of a license "free of charge"[79] and does require that the charge be reasonable,[80] but otherwise it furnishes no guidance. The explanation for this is that when Congress was drafting the Federal Water Power Act, it considered a number of specific methods by which the amount of a Section 10(e) charge might be derived,[81] but in the end it abandoned all of them in favor of a provision enabling the Commission to exercise a broad discretion in light of the factors relevant.[82]

This put the Commission in position to devise and oversee the program for annual charges. The Supreme Court has declared that " '[t]he power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress,' "[83] and here the gap was left deliberately. When "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation,"[84] and "[s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."[85]

From 1927 to 1980, the Commission usually established dam-use charges, on a case-by-case basis, by dividing equally between the Government and the licensee the net benefits received by the latter.[86] Benefit from a license to use a Government dam was measured by the actual value of the use to the specific licensee.[87] In the late 1970's, however, the Commission began to reconsider its methodology and in 1983 it proposed a rule designed to amend its regulations governing Section 10(e) charges.[88]

**76.** 132 Cong.Rec. 16,549 (1986).

**77.** See notes 71–73 supra and accompanying text.

**78.** Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694, 702–703 (1984).

**79.** See text supra at note 69.

**80.** See text supra at note 52.

**81.** See Annual Charges, supra note 24, 49 Fed. Reg. at 22,771 and legislative history cited therein.

**82.** Id. See also City of Vanceburg v. FERC, supra note 57, 187 U.S.App.D.C. at 210–212, 571 F.2d at 644–646.

**83.** Chevron U.S.A., Inc. v. NRDC, supra note 78, 467 U.S. at 843, 104 S.Ct. at 2782, 81 L.Ed.2d at

703 (quoting Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270, 292 (1974)).

**84.** Id. at 843–844, 104 S.Ct. at 2782, 81 L.Ed.2d at 703.

**85.** Id. at 844, 104 S.Ct. at 2782, 81 L.Ed.2d at 703.

**86.** Annual Charges, supra note 24, 49 Fed.Reg. at 22,771.

**87.** City of Vanceburg v. FERC, supra note 57, 187 U.S.App.D.C. at 212–213, 571 F.2d at 646–647.

**88.** Annual Charges, supra note 24, 49 Fed.Reg. at 22,771; Annual Charges for Use of Government Dams and Other Structures Under Part I of the Federal Power Act, 48 Fed.Reg. 15,134

During the course of the proceedings ensuing, the Commission reexamined the situation of licensees who were making or had made payments to a federal agency in partial defrayal of the expense of building a dam or other structure. In 1984, the Commission promulgated final regulations prescribing a graduated flat-rate approach to the determination of such charges.[89]

As proposed, the regulations would not have allowed any credit toward annual charges to licensees whose payments had effected some partial reimbursement of the cost of constructing a dam.[90] The Commission felt that "these payments 'are normally designed to repay the costs of construction of the dam or for benefits not related to power produced at the dam' while 10(e) payments are meant to be for the value of the economic benefit conferred by the federal government."[91] And, the Commission added, "neither the statute, its legislative history, nor the case law indicate that the cost of the Federal facility is relevant to setting annual charges."[92] In response to comments vigorously objecting thereto, however, the Commission modified its position somewhat:

> The Commission recognizes that situations may arise in which a prospective licensee agrees with a government agency to share in certain costs of construction other than those costs directly related to electric power production. In some of these situations it may be reasonable to adjust the annual charges imposed by the Commission in this rule to account for these other payments by the licensee. Because the specific circumstances of such cases will generally be known to the prospective licensee before a license ap-

plication is filed, the burden is upon the prospective licensee to explain the circumstances in the application (or in a new filing if the license is already issued) and to request a specific adjustment to the charges imposed by this Commission. Such cases will be considered by the Commission as they arise, and adjustments to the annual charges will be made when they are justified.[93]

On rehearing, the Commission explained its policy even more fully. "There are," it noted, "a wide variety of arrangements under which licensees or prospective licensees make payments to other Federal agencies related to Federal dams;"[94] as one "example, an irrigation district licensee may have agreed with the Bureau of Reclamation to pay for part of the irrigation dam. This agreement often is made while the dam is authorized for irrigation and, possibly, flood control purposes."[95] There are, too, the Commission said, "[m]any factors [that] can bear on whether a credit should be given,"[96] including "the size of the payments, the contractual arrangements between the non-Federal and Federal entities, the purposes for which payments are made, relevant legislation, and other equitable considerations."[97] "Thus," the Commission concluded, "when a licensee enters into a contract to help defray the costs of an irrigation dam for reasons relating to irrigation and flood control, no credit is appropriate because the licensee is not making payments related to power purposes";[98] rather, "the appropriate policy is to limit the availability of a credit against annual charges to situations in which the original contract shows clearly that the payments for dam construction, operation

(1983) (notice of proposed rulemaking) [hereinafter Proposed Rule].

**89.** Annual Charges, *supra* note 24, 49 Fed.Reg. at 22,778 (codified as amended at 18 C.F.R. § 11.3 (1990)).

**90.** *Id.* at 22,773.

**91.** *Id.* at 22,773–22,774 (quoting Proposed Rule, *supra* note 88, 48 Fed.Reg. at 15,148).

**92.** *Id.* at 22,777.

**93.** *Id.* at 22,774.

**94.** Annual Charges for Use of Government Dams and Other Structures (Order No. 379–A), 49 Fed.Reg. 33,859, 33,861 (1984) (granting rehearing in part).

**95.** *Id.*

**96.** *Id.*

**97.** *Id.*

**98.** *Id.*

and maintenance are partly or entirely for power purposes." [99] Lastly, the Commission ordained, "[i]ndividual licensees must demonstrate that their circumstances justify allowing a credit." [100]

When we decided *City of Vanceburg*, [101] the Commission's regulations provided that annual charges "will be based upon the estimated value for power purposes of the properties and privileges for which a license is issued." [102] We upheld this criterion, [103] ruling that "it is not the value of the use for any purpose that the Commission must ascertain, but the value of use for a particular purpose, namely, generating electric-power." [104] The Commission's current regulations feature a graduated flat-rate approach to determination of annual charges for use of Government dams or other structures. [105] It is based upon the amount of energy a facility produces, with lower rates applied to smaller amounts of energy and higher rates to larger quantities of energy. [106] This formula remains faithful to the principle that charges must be compensatory [107] and must relate to the value of the benefit conferred, [108] and to *City of Vanceburg*'s admonition that it is the value to power production that counts. [109]

The Commission's present regulations, we repeat, do not provide for waiver of Section 10(e) as such. The reason is that the graduated flat-rate "approach is specifically designed so that annual charges will weigh lightly on projects which produce small amounts of energy in any given year" [110] and that "the rates that have been selected should be low enough to avoid any economic hardship." [111] The Commission acknowledges, however, that when a licensee is making or has made payments to another federal agency toward the cost of dam construction, reasonableness may demand an adjustment of Section 10(e) charges. [112] That, in essence, would be a species of waiver, and a mechanism by which disgruntled licensees could adequately ventilate their grievances with charges.

### B. The Bid For Readjustment

The Districts register several objections to the Commission's new methodology. They point to earlier cases wherein the Commission granted waivers of Section 10(e) charges [113] and complain that the Commission's orders depart impermissibly from those precedents. The Commission disputes that claim, but we need not enter into the debate on that score. After rendition of these decisions, the Commission reconsidered its stance on Section 10(e) charges and issued regulations establishing a new methodology. [114] It is well settled that "an agency is free to alter its past rulings and practices," [115] and even to "re-

---

**99.** *Id.*

**100.** *Id.*

**101.** *Supra* note 57.

**102.** 187 U.S.App.D.C. at 200, 571 F.2d at 634 (quoting 18 C.F.R. § 11.22 (1977)).

**103.** *Id.* at 212–214, 571 F.2d at 646–648.

**104.** *Id.* at 212, 571 F.2d at 646 (emphasis deleted).

**105.** Annual charges, *supra* note 24, 49 Fed.Reg. 22,771–22,772.

**106.** *Id.*

**107.** See notes 61–64 *supra* and accompanying text.

**108.** See note 64 *supra* and accompanying text.

**109.** See text *supra* at note 104.

**110.** Annual Charges, *supra* note 24, 49 Fed.Reg. at 22,775.

**111.** *Id.*

**112.** See text *supra* at note 93.

**113.** The cases identified are *California Oregon Power Co.*, 15 F.P.C. 14 (1956); *Idaho Power Co.*, 53 F.P.C. 1017 (1975); *South Columbia Basin Irrigation Dist.*, 10 F.E.R.C. ¶ 61,285 (1980); and *Utah Power & Light Co.*, 13 F.E.R.C. ¶ 62,039 (1980) (order issuing license).

**114.** 18 C.F.R. § 11.3 (1990).

**115.** *Hatch v. FERC*, 210 U.S.App.D.C. 110, 119, 654 F.2d 825, 834 (1981). See also *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443, 466 (1983); *Center for Science in*

verse its course." [116]  To be sure, the agency "must provide a reasoned explanation for any failure to adhere to its own precedents," [117] but that the Commission plainly did here.

The Districts further contend that the orders in the present case mistreat their contract payments and thereby exact a double recovery for the Government.  The Commission responded to this argument by pointing out that the "double payments" were consequences of the separate charging schemes of Section 10(e) and the reclamation laws, and of the differences in purposes and benefits for which the payments were made:

> The reclamation laws provide a comprehensive reclamation scheme for the examination and survey of arid and semi-arid Western United States lands and for the construction and maintenance of feasible irrigation works for the storage, diversion and development of water for the reclamation of these lands. . . .
>
> Nothing in these laws, however, conflicts with or permits the waiver of the Commission's authority to impose annual charges for the use of [Government] dams.  Rather, these provisions of the reclamation laws and Section 10(e) of the Federal Power Act represent separate and distinct legislative schemes.  The legislative history of the Federal Power Act reveals no intention to limit the Secretary's authority to grant leases of power privileges. . . .  Similarly, nothing in the reclamation laws postdating the Federal Power Act, including the Columbia Basin Project Act, or their respective legislative histories reveals any intent to amend or repeal the Federal Power Act

so as to limit the Commission's power to impose Section 10(e) annual charges. [118]

The crucial inquiry, we think, is not whether the Districts have been called upon to make payments pursuant to each of two separate statutory regimes, but whether the payments related to the same power-production benefit.  A single payment for irrigation or flood control benefits obviously would not duplicate a Section 10(e) payment for a particular power-generation benefit while two payments for that benefit surely would, but in the latter event the Commission is prepared to consider a credit.  In such circumstances, credits have been awarded in the past, [119] and the Commission's current regulations promise the same consideration in the future. [120]

We are mindful of the consideration that the regulations place upon the licensee the burden of showing that a credit is reasonably justified. [121]  We find no fault with this allocation since it is to the licensee, and hardly to the Commission, that the information relevant is available.  In *City of Vanceburg*, [122] we declared that "[a] licensee challenging the reasonableness of annual dam-use charges carries the heavy burden of making a convincing showing that the charges are unreasonable or otherwise unauthorized." [123]  The burden-of-proof requirement now imposed by the regulations is thus of the very sort we earlier approved.

It was the failure of the Districts to discharge their burden that led to their downfall.  As the Commission described it, they

> provide[ ] no evidence or procedure enabling [us] to calculate a reasonable ad-

*the Pub. Interest v. Department of Treasury,* 254 U.S.App.D.C. 328, 332, 797 F.2d 995, 999 (1986); *United States Lines v. FMC,* 189 U.S.App.D.C. 361, 368, 584 F.2d 519, 526 (1978).

**116.**  *Boston Edison Co. v. FPC,* 181 U.S.App.D.C. 222, 226, 557 F.2d 845, 849, *cert. denied,* 434 U.S. 956, 98 S.Ct. 482, 54 L.Ed.2d 314 (1977).

**117.**  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., supra* note 115, 463 U.S. at 57, 103 S.Ct. at 2874, 77 L.Ed.2d at 466; *Center for Science in the Pub. Interest v. Department of Treasury, supra* note 115, 254 U.S.App.D.C. at

332, 797 F.2d at 999;  *Hatch v. FERC, supra* note 115, 210 U.S.App.D.C. at 119, 654 F.2d at 834.

**118.**  *Commission Order I, supra* note 16, 21 F.E.R.C. at 61,283.

**119.**  See cases cited *supra* note 113.

**120.**  See 18 C.F.R. § 11.3(d) (1990).

**121.**  See *id.*

**122.**  *Supra* note 57.

**123.**  187 U.S.App.D.C. at 214, 571 F.2d at 648.

justment of charges. [Their] [p]roject[s] ... utilize only a small part of the Columbia Basin Project's vast system of irrigation canals and facilities. The [Districts] give no indication as to what portion of [their] contract payments is in exchange for the right to develop power at the three project sites. Absent such a showing, it is impossible to determine whether the Districts' reclamation contract payments fully recompense the United States for the use of its property for power purposes. Since the annual charges at issue here are the Commission's responsibility to collect, the adequacy of such alternative payment arrangements must be clearly demonstrated before the Commission can consider recognizing them as payments in lieu of annual charges. The [Districts] have failed to establish the adequacy of the contract payments here involved.[124]

In *City of Vanceburg*,[125] we encountered the same scenario.[126] We found that the city had not discharged its burden of demonstrating unreasonableness or unlawfulness, and we accordingly sustained the Commission.[127] In the cases before us, we can do no less.

The orders under review are accordingly

*Affirmed.*

---

**124.** *Order Denying Offer of Settlement, supra* note 23, 31 F.E.R.C. at 61,559.

**125.** *Supra* note 57.

**126.** See 187 U.S.App.D.C. at 214–215, 571 F.2d at 648–649.

**127.** *Id.*